**CLEVELAND TELEVISION CORPORATION,**
Appellant,

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Channel 19, Inc., Intervenor.**

**No. 83–1659.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 24, 1984.

Decided April 20, 1984.

David G. Rozzelle, Washington, D.C., with whom Robert L. Heald, Robert J. Rawson and Patricia A. Mahoney, Washington, D.C., were on brief, for appellant.

Sue Ann Preskill, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief, for appellee.

David D. Oxenford, Jr., Washington, D.C., with whom Ben C. Fisher and Samuel Miller, Washington, D.C., were on brief, for intervenor.

Before WALD and MIKVA, Circuit Judges, and VAN DUSEN,* Senior Circuit Judge for the United States Court of Appeals for the Third Circuit.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge.

Cleveland Television Corporation (CTC) challenges a Federal Communications Commission (FCC or Commission) decision to deny CTC's application for a construction permit to establish a new UHF television broadcast station in the Cleveland, Ohio area, while granting the competing and mu-tually exclusive application of Channel 19, an intervenor in this appeal. CTC believes that it should have been granted the FCC permit because one group of Channel 19's principal owners—the so-called "Malrite group"—also owns two radio stations in the Cleveland area as well as numerous other broadcast and cable stations elsewhere in the United States. CTC contends that the Channel 19 application should have been (1) disqualified under the FCC's multiple ownership rule, (2) disqualified under the FCC's cross-interest policy, or (3) denied on the basis of the FCC's standard comparative criterion to promote diversification of control in the mass media.

We disagree. The interests held by the Malrite principals in Channel 19 do not rise to the level of controlling ownership. Channel 19 structured its financing in a way that significantly isolates the Malrite principals from working control of corporate affairs. Similarly, the Commission properly found that the Malrite holdings do not constitute a prohibited cross-interest. While we question other independent grounds offered by the Commission in support of its cross-interest determination, we find that the Commission reasonably concluded that the Malrite holdings do not represent the "meaningful relationship" with Channel 19 necessary to disqualify the Channel 19 application under the cross-interest policy. Finally, we approve the Commission's application of its standard comparative criteria—integration of ownership with management and diversification of control—to this case. We therefore affirm the FCC order.

I. BACKGROUND

CTC and Channel 19 both filed applications with the FCC to construct a UHF television station in the Cleveland area. In its original application, Channel 19 divided its common stock equally among its three principals, Metroplex Communications (Metroplex), Diamond Broadcasting, Inc. (Diamond), and the "Malrite group."[1]

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Metroplex is a partnership between Norman Wain and Robert Weiss. Wain and Weiss both are long-time residents of the Cleveland area

Under FCC rules, applicants may amend their applications as a matter of right until the "cut off" date specified by the Commission. In this case, the FCC set July 31, 1979 as the cut off date. *See* J.A. at 246–47. On July 23, 1970, Channel 19 amended its application to reflect its altered corporate structure, in which the Malrite group would receive only nonvoting preferred stock, and would not occupy any corporate offices. *See* J.A. at 248–56. After the cut off date, Channel 19 twice attempted to make a further amendment including more elaborate changes in its Articles of Incorporation. On November 5, 1980, the ALJ accepted this additional amendment.[2]

In April 1982, after evidentiary hearings, the ALJ issued his Initial Decision granting Channel 19's application. *See* 91 F.C.C.2d 1148 (1982). As a result of his analysis of the terms of the Malrite preferred shares, the ALJ concluded that the Malrite holdings lacked the "contingent control rights" necessary to "invoke the strictures of the multiple ownership rules." *Id.* at 1161. The ALJ also found that in the absence of

and have substantial broadcasting experience. *See* 91 F.C.C.2d at 1157–58. Through other corporate enterprises, they also own substantial interests in a number of broadcast stations around the United States, none of which serves the Cleveland area. *See id.*

Diamond Broadcasting is a wholly owned subsidiary of Overlook TV Group, Inc., which is 90% owned by Overlook Communications Systems, which, in turn, is 83% owned by Hubert Payne and 5% owned by William Derrick. Payne has lived in the Cleveland area since 1946 and has substantial broadcasting experience; Derrick has lived there since 1970. Both Payne and Derrick are black, and Channel 19 plans to make Payne its General Manager.

The "Malrite group"—Milton Maltz, Carl E. Hirsch and John R. Wilson—owns an AM and an FM radio station in the Cleveland area, in addition to a large number of other TV, radio and cable stations throughout the country. Virtually all of Malrite's stock is owned by Maltz. Hirsch and Wilson, who are both officers and directors of Malrite, hold small interests.

2. Under the first amended application, the Malrite preferred shares would be converted to voting common shares only "in the event the Rules of the Federal Communications Commission permit ownership, in whole or in part, by the owner of an AM and/or FM station in the same market as the UHF station." *First Amended and Restated Articles of Incorporation of Channel 19, Inc.* art. IV, *reprinted in* J.A. at 252. Under the second amended application, the Malrite preferred shares would be nonvoting shares that could be converted to voting common shares only (1) five years after their issuance, (2) if "conversion will not result in a violation of any federal statute administered by the Federal Communications Commission ... or any valid regulation promulgated thereunder," and (3) after approval by a vote of the common shareholders, if the preferred shares are held by persons other than the Malrite principals. *Amended Articles of Incorporation of Channel 19, Inc.* art. IV, para. 1, sec. 3, *reprinted in* J.A. at 317–18.

CTC objects to the ALJ's acceptance of the second amendment after the "cut off" date. Under the Commission's rules, an amendment may be made after the cut off date (1) "only upon a showing of good cause for late filing" or (2) as a matter of right if the amendment "relate[es] to issues first raised in the [hearing] designation order." *See* 47 CFR § 73.3522(b)(1), (2) (1982).

The Commission defends the acceptance of the amendment on two grounds. First, it argues that the amendment relates to an issue "first raised in the designation order," *i.e.*, the cross-ownership issue. As the ALJ explained, "While Channel 19 was undoubtedly cognizant of the cross ownership problem ... the matter was not identified as one requiring an evidentiary hearing until the order of designation was issued." J.A. at 46. This explanation, however, proves too much, for it would apparently permit fees amendment as to *any* issue set down for hearing by the designation order. After all, the purpose of the hearing designation order is to identify issues "requiring an evidentiary hearing." By contrast, the regulations permit amendment as to "issues first *raised* " in the designation order, not issues first set down for hearing in the order.

However, as the Review Board noted, the particular amendment in question "merely clarified Channel 19's pre-designation proposal ..., it resulted in no comparative improvement because the comparative consequences of the preferred stock ownership in this case had already attached." 91 F.C.C.2d at 1135 n. 3. The disputed amendment made no fundamental changes in Channel 19's corporate structure; the basic contours of that structure had already been set out in the first amended application, which was clearly permissible as of right. Thus, CTC suffered no comparative harm due to the amendment. *See Annax Broadcasting, Inc.*, 87 F.C. C.2d 483, 488 (1981). Finally, we note that the amendment related to the cross ownership and cross-interest issues—both potentially disqualifying issues—and the Commission has followed a liberal amendment policy "especially where a proffered amendment is intended to cure a disqualifying defect." *Id.* at 489.

significant control rights, the Malrite stock holdings did not constitute "an interest sufficient to warrant the disqualification of Channel 19" under the cross-interest policy because "the potential for influence on corporate management" was not strong. *See id.* Overall, however, due to the Malrite preferred stock holdings as well as Metroplex's ownership of broadcast stations in communities far away from Cleveland,[3] the ALJ accorded to CTC a moderate diversification preference. *See id.* at 1167.

The ALJ also considered the integration of ownership with management in CTC and Channel 19. He found that "[a]ll of Channel 19's common (voting) stockholders will be involved on a day-to-day basis in the management of its proposed station," while "CTC has shown 15% full-time integration and 20% part time." *Id.* at 1164. Furthermore, numerous Channel 19 principals are Cleveland residents with considerable broadcast experience and strong community ties. The ALJ also noted that Hubert Payne, an owner of 50% of the common stock and the proposed general manager of Channel 19, is black—a fact "of particular significance in this case in light of the Cleveland area's large minority population." *Id.* at 1165. Accordingly, the ALJ awarded to Channel 19 a "decided preference" for integration. *See id.* at 1166. The ALJ therefore granted Channel 19 the permit because its superior integration sufficiently outweighed the "negative effects of its principals' existing media interests." *Id.* at 1169.

The Review Board affirmed the ALJ's decision with some modifications. *See* 91 F.C.C.2d 1129 (Rev.Bd.1982). The Board agreed that the Malrite preferred stock "involves insufficient incidents of contingent control of Channel 19 to violate the multiple ownership rules." *Id.* at 1132. In addition, the Board found that the Commission's policy against cross-interests had not been transgressed because (1) the issue had not been properly raised, (2) no specific factual allegations had been made to show how the alleged cross-interest would be contrary to the public interest, and (3) the Malrite holdings did not create a sufficiently "meaningful relationship" with Channel 19 to give rise to a prohibited cross-interest. *See id.* at 1133–35. Finally, the Board reduced CTC's diversification preference to a "slight preference" because it considered the Malrite preferred stock holdings to have no meaningful effect on the management of Channel 19, while it viewed CTC's cross-ownership of another UHF station in Detroit, 100 miles from Cleveland, to be "more significant" than the Malrite's Cleveland radio stations. *See id.* at 1139. Approving the ALJ's finding of a substantial preference for integration, the Board concluded that the Channel 19 proposal would best serve the public interest. *Id.* at 1143.

CTC then sought review by the full Commission. On May 18, 1983, the Commission released an order denying review.[4] *See* J.A. at 1–2. CTC now appeals to this court.

## II. MULTIPLE OWNERSHIP

■ CTC contends that the FCC departed from its own multiple ownership rule when it granted the UHF television permit to Channel 19 despite the Malrite principals' ownership of two radio stations in the Cleveland area. By its terms, the multiple ownership rule disqualifies applicants who "own, operate, or control" overlapping broadcast facilities.[5] *See Radio Athens,*

---

3. Metroplex principals hold interests in broadcast stations in Virginia, Missouri, Texas, and Florida. *See* 91 F.C.C.2d at 1158; *see also* CTC Brief at 16 n. 12.

4. Under 47 U.S.C. § 155(c)(1), the full Commission may delegate functions to "a panel of commissioners, an individual commissioner, an employee board, or an individual employee." If the Commission chooses not to review an action taken pursuant to such a delegation, then that action has "the same force and effect" as an

action by the full Commission. *Id.* § 155(c)(3). Accordingly, in this opinion the Review Board's decision is also referred to as an action by the Commission.

5. *See* 47 C.F.R. § 73.636(a)(1) ("No license for a television broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates, or controls ... one or more AM broadcast stations ... or one or more FM broadcast stations" in the same broadcast area.).

*Inc. v. FCC,* 401 F.2d 398, 401 (D.C.Cir. 1968).

The rule encompasses various forms of working control over a proposed broadcast facility, whether or not such control is manifested by a majority share of voting stock. *See* 47 C.F.R. § 73.636 note 1 ("The word 'control' as used herein is not limited to majority stock ownership, but includes actual working control in whatever manner exercised."). CTC argues that the Malrite principals possess such working control over the affairs of Channel 19 by virtue of (1) the Malrite group's ownership of a one-third equity interest in Channel 19, (2) the group's historical involvement in the formation of Channel 19, (3) a guarantee by Malrite's majority stockholder of one-third of the bank loan used to finance Diamond Broadcasting's purchase of fifty percent of Channel 19's common stock, and (4) Channel 19's close corporation status, which, according to CTC, permits the Malrite group to dominate the station's affairs. The FCC, on the other hand, determined that the Malrite interests "involve[ ] insufficient incidents of contingent control of Channel 19 to violate the multiple ownership rules." 91 F.C.C.2d at 1132. Because the FCC reasonably concluded on the basis of the relevant evidence that the Malrite group does not possess the requisite working control over Channel 19, we hold that the award of the construction permit to Channel 19 did not contravene the Commission's multiple ownership rule.

 To begin with, we note that the Malrite group owns only a one-third equity share in Channel 19. An owner of one-third of a corporation's equity may, of course, exercise control in fact, especially if the one-third share represents the largest voting block in the corporation. Such an interest by itself, however, does not constitute working control as a matter of law. *See Radio Athens,* 401 F.2d at 401–02; *see also United Community Enterprises, Inc.,* 37 F.C.C.2d 953, 957, 959 (Rev.Bd. 1972). Furthermore, the Malrite equity share is comprised solely of *nonvoting* preferred stock. By contrast, the multiple ownership rule expressly focuses attention upon ownership of "voting stock" as an indicator of control. *See* 47 C.F.R. § 73.-636 notes 2, 3, 4, 5, 6, 7; *see also Evening Star Broadcasting Co.,* 67 F.C.C.2d 318, 323–25 (1978). In other circumstances, the ownership of a nonvoting stock might enable a party to control the destiny of the broadcast facility.[6] In this case, however, the Commission reasonably determined that the Malrite group's preferred stock holdings did not represent a controlling interest in Channel 19.

 We also find that the Malrite group's involvement in the pre-operational planning and financing of Channel 19 does not evidence working control, even when considered cumulatively along with the preferred stock ownership. First, we agree with the Commission that "CTC's emphasis on the predictive implications of earlier activities of the Malrite principals in Channel 19 corporate planning and decision-making ... is conjectural and does not itself establish any continuing involvement on their part." 91 F.C.C.2d at 1132. In fact, Channel 19's general manager in a sworn affidavit emphasized that "[i]t was [Channel 19's] purpose ... to insulate totally the [Malrite]

---

The multiple ownership rules, however, confer discretion upon the Commission to decide cases involving common ownership of a *UHF* television station and radio stations in the same area on a case-by-case basis. *See id.* § 73.636 note 8; *infra* at 972. The fact that the Malrite group owns *two* radio stations—one AM and one FM station—in the Cleveland area would not alter the Commission's discretion to decide whether ownership of the additional UHF station were in the public interest. *See* 47 CFR § 73.636 note 11 ("AM and FM broadcast stations licensed to communities ... within the same urbanized areas ... will be considered as a combination and counted as one station.").

**6.** For example, greater control could be evidenced by the existence of an unconditional right to convert the nonvoting preferred shares into voting stock. In this case, however, the Malrite's preferred shares may not be converted until after five years from their initial issuance, and then only if such conversion would not violate the Commission's rules. *See Amended Articles of Incorporation of Channel 19, Inc.* art. IV, para. 1, sec. 3, *reprinted in* J.A. at 317.

group from any responsibility for or involvement in the operation of our Company." J.A. at 127 (affidavit of Hubert B. Payne). CTC cites no evidence to refute this testimony. The ALJ thus had a sufficient basis for his finding of fact that Channel 19 intended to remove the Malrite group from all future participation in decision-making on matters concerning the station's operations. *See* 91 F.C.C.2d at 1151. Accordingly, we will not disturb that finding. *See, e.g., FCC v. WOKO, Inc.,* 329 U.S. 223, 226, 67 S.Ct. 213, 214, 91 L.Ed. 204 (1946); *Faulkner Radio, Inc. v. FCC,* 557 F.2d 866, 870 (D.C.Cir.1977).

█ Neither does the fact that Maltz guaranteed a bank loan, used to finance the Diamond common stock purchases, transform the interests of the Malrite group, which Maltz controls, into the requisite working control of Channel 19. After all, the Maltz guarantee covers only eleven percent of Channel 19's total paid-in capital,[7] and the benefits to Maltz in the event of a default are unclear.[8] At the extreme, however, the Malrite financial involvement in Channel 19 could be seen to extend to 44 percent of the paid-in capital—the funds covered by the guarantee plus the preferred stock capital contribution. This financial interest, while substantial, is more than offset by Metroplex's financial involvement, which at the extreme could be seen to include more than *55 percent of* the paid-in capital. Metroplex guaranteed *two-thirds* of the Diamond loan, covering over 22 percent of the paid-in capital, and owns one-half of the common stock of Channel 19, representing another 33 percent of the paid-in capital. Thus, in any event the Malrite group could not control Channel 19 over the objections of Metroplex. *Cf. WLOX Broadcasting Co. v. FCC,* 260 F.2d 712, 715–16 (D.C.Cir.1958) (a lender of money needed to construct station, although only a small minority stockholder, "will be in a position to dictate the manner of operating the proposed station, and ... probably will gain control of [the station]"). Accordingly, the FCC reasonably determined that the Malrite group's purely financial interests in the loan and their preferred stock would not enable it to exercise control over the station's operations. *See* 91 F.C.C.2d at 1133.

CTC also argues at length that this court should disregard the corporate structure of Channel 19 and attribute to it all the ownership interests of the Malrite group. *See*

---

**7.** Maltz guaranteed one-third of the Diamond bank loan, while Metroplex guaranteed the remaining two-thirds. The bank loan financed Diamond's one-third equity share in Channel 19. Accordingly, Maltz guaranteed one-ninth ($\frac{1}{3} \times \frac{1}{3}$) of the paid-in capital while Metroplex guaranteed two-ninths ($\frac{1}{3} \times \frac{2}{3}$) of the paid-in capital.

**8.** In his testimony, Mr. Payne of Diamond Broadcasting at one point said that "we really have not gone into detail as to what happens if Bill [Derrick] and I default." J.A. at 149. This testimony is consistent with Payne's affidavit in which he explained:

We have no understandings or agreements whatsoever, either with the Bank or anyone else, regarding what would happen in the event that Diamond Broadcasting, Inc. is in default under its loan and the Bank is forced to turn to the guarantors for satisfaction. We have briefly discussed this situation with Messrs. Wain, Weiss and Maltz [the Malrite principals], but have not reached any understanding of how we would handle a default. We prefer instead to await future developments.

*Affidavit of Hubert B. Payne* at 9 (Nov.1980), *reprinted in* J.A. at 128. On cross-examination by CTC, however, Payne was asked to explain a letter to Diamond Broadcasting from Maltz of Malrite and Wayne of Metroplex:

Q: Have you had an opportunity to read that?

A: Yes.

Q: Now, under the terms of their agreeing to be guarantors, Mr. Maltz and the Metroplex people have indicated in their letter that they would require Diamond to pledge the stock of Channel 19 that Diamond held. Is that correct?

A: Yes, if the Bank does not require it. J.A. at 151.

Under other circumstances, the Commission's failure to examine the consequences of a default might constitute an abdication of its statutory duty to determine which applicant can best serve the "public interest, convenience and necessity." *See* 47 U.S.C. 309(a). However, as explained *supra* note 7, in this case the worst possible scenario would not give rise to a multiple ownership or cross-interest disqualification.

CTC Brief at 18–24. According to CTC, Channel 19's corporate veil should be pierced simply because it is a closely-held corporation, and closely-held corporations often operate as if no corporate structure exists. *See* CTC Brief at 21–24. Moreover, CTC contends that the Malrite group and Channel 19 should be considered identical in interests because, under Ohio law, Channel 19, as a closely-held corporation, could abolish its board of directors and thereafter ignore corporate formalities, with the Malrite principals playing key roles. *See* Ohio Rev.Stats. § 1701.591.

■ In effect, CTC asks this court to hold that *any* closely-held corporation may be disregarded as a legal fiction, regardless whether sufficient proof has been adduced to show that corporate formalities and structure are in fact being disregarded. We decline to order the Commission to disregard an applicant's corporate structure on the basis of a mere suspicion, unsupported by the evidence, that the applicant will operate as if no corporate structure existed. Furthermore, CTC's reliance on Ohio's close corporation statute is misplaced. Under the statute, to alter the corporate structure, every shareholder must assent in writing. *See* Ohio Rev. Stats. § 1701.591. The corporate structure of an Ohio close corporation is therefore malleable; it nevertheless remains a corporate structure, which will not be overlooked without an adequate showing that in practice the corporation is a sham. Such a showing has not been made in this case. Accordingly, we uphold the Commission's determination that the Channel 19 application did not violate the multiple ownership rule.

## III. CROSS-INTERESTS POLICY

CTC further contends that the FCC decision to grant a permit to Channel 19 contravenes its longstanding cross-interests policy. While we agree that part of the Commission's rationale does depart from established agency practice without adequate explanation, we find that another independent ground offered by the Commission adequately supports its decision. We therefore affirm the agency's order.

■ The FCC's cross-interest policy stems from its prohibitions on common ownership and control contained in its multiple ownership rule. The cross-interest policy extends this prohibition to individuals who are principals of an applicant and who have some meaningful relationship with an existing facility serving substantially the same area. *See, e.g., Radio Athens, Inc. v. FCC*, 401 F.2d 398, 402 (D.C. Cir.1968); *Guy S. Erway*, 90 F.C.C.2d 750, 752 (Rev.Bd.1980); *K & M Broadcasters, Inc.*, 19 F.C.C.2d 947 (Rev.Bd.1969). The policy is therefore implicated "in any case of cross interest, whether or not the interest is tantamount to ownership, operation or control." *Radio Athens*, 401 F.2d at 402. The objective of the policy is the promotion and maintenance of full competition within a given broadcast area. *See Guy S. Erway*, 90 F.C.C.2d at 752; *Carolina Broadcast Service*, 25 Rad.Reg. (P & F) 515, 515 (1963).

■ The Commission held that its cross-interest policy was not violated in this case. First, the Commission found that the cross-interest question had not been properly raised as an issue specifically designated for hearing. *See* 91 F.C.C.2d at 1134. However, as Board Member Blumenthal noted in his statement concurring *dubitante*, the Commission's hearing designation order gave notice to the parties that the impending proceeding would:

> determine with respect to Channel 19 the extent of common ownership, operation and control between stations WHK [AM] and WMMS (FM) [the two Malrite radio stations in the Cleveland area] and the proposed television station, and whether said ownership would be in the public interest.

*Hearing Designation Order* at 3 (July 29, 1980), *reprinted in* J.A. at 49, *quoted in* 91 F.C.C.2d at 1146 (Blumenthal, Board Member, concurring *dubitante* ). This notice clearly opens the way for an examination of whether the Malrite interests would ren-

der Channel 19's application contrary to the public interest. The public interest rubric is very broad, encompassing the multiple ownership rule, the cross-interest policy, and the various comparative criteria, including diversification of media interests. *See FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 785–87, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Allied Broadcasting, Inc. v. FCC*, 435 F.2d 68, 71 (D.C.Cir.1970). Consequently, the Commission had the cross-interest issue properly before it when it went on to discuss and dispose of the issue.

■■■ As a second ground for rejecting the cross-interest claim, the Commission found that CTC had failed to make "specific allegations of fact" to show how the relevant cross-interests would be contrary to the public interest. 91 F.C.C.2d at 1134 (quoting *Atlantic Broadcasting Co. (WUST)*, 5 F.C.C.2d 717, 718 (1966)). Insofar as this passage articulates a requirement of specific proof that a given cross-interest will in practice result in anti-competitive effects, we think it runs counter to clearly articulated and well established principles underlying the cross-interests policy. In the past, the Commission has viewed the goal of the policy to be *prevention* of anti-competitive practices. Thus, specific showings of anti-competitive *results* were not required:

> Because the Commission is unable to keep the changing personal relationships in each individual case under constant surveillance, the controlling factor in each situation must be the simple fact of the cross-interest itself.... While it may be true that, at a given time, no impairment of competition exists in fact, it is the potential of such impairment which the Commission's policy is designed to guard against.

*Carolina Broadcasting Service, Inc.*, 25 Rad.Reg. (P & F) at 515–16; *see McGavren Guild, Inc.*, 80 F.C.C.2d 339, 349 (1980) ("[T]he cross-interest policy and the multiple ownership rules are based on the assumption that if the industry is structured so as to be owned and controlled by diverse entities, the desired program diversity and

competition will ensue. In administering our policy, a structural approach does not involve us in business practices and interrelationships that can change rapidly over time."). Moreover, evidence of specific abuses by common owners or cross-interested parties is at best difficult to compile, and, at the pre-permit stage, obviously impossible. *Cf. FCC v. National Citizens Committee for Broadcasting*, 436 U.S. at 797, 98 S.Ct. at 2113 (upholding multiple ownership rules despite lack of "detailed forecast" of competitive benefits). As a result, we do not endorse the FCC's apparently sudden and unexplained departure from its usual practices in this field.

The Commission, however, also made the fundamental substantive judgment that the record showed "inadequate indicia of control to make the Malrite group's 'relationship' with Channel 19 sufficiently 'meaningful' to raise a legally cognizable cross-interest inference." 91 F.C.C.2d at 1134–35. CTC believes that this ruling was in error because, in its view, the Commission's cross-interest policy generally prohibits *"any degree of common ownership* between stations" in the same broadcast area. CTC Brief at 34 (emphasis in original). Accordingly, CTC argues that the Malrite preferred stock ownership in Channel 19 constitutes an impermissible cross-interest.

■■■ We find untenable CTC's position that "any degree of common ownership" creates a prohibited cross-interest. The FCC policy instead applies only when the principal or principals in question simultaneously maintain a *meaningful relationship* with the proposed and existing facilities. *See, e.g., Guy S. Erway*, 90 F.C.C.2d at 752; *Morris, Pierce & Pierce*, 88 F.C.C.2d 713, 716 n. 3 (Rev.Bd.1981). Obviously, an insignificantly small equity interest in a broadcast station—such as, for example, a 50-share block in RCA—does not give rise to a prohibited cross-interest. The relevant question accordingly may be framed: Did the FCC act reasonably when it determined that the Malrite preferred stock

holdings in Channel 19 did not create a "meaningful relationship" with the proposed station? For the reasons set forth below, we conclude that it did.

As discussed *supra* at 967–968, the rights associated with the Malrite preferred stock are expressly limited to exclude *control rights* over the affairs of the station. These preferred shares have no associated voting rights, except in extraordinary circumstances on fundamental corporate questions, and they may not be converted into voting common shares unless such conversion would not violate Commission policies.[9]

The preferred shares do, of course, represent a significant *financial* interest in Channel 19. Because the shares are "participating preferred," the Malrite principals have a greater financial interest in the growth and success of Channel 19 than, for example, a mere lender would have.[10] We therefore find, contrary to the Commission's assertions in its brief, that the Malrite's preferred stock ownership does not constitute a merely passive interest in Channel 19. *Cf.* FCC Brief at 27.

 Nevertheless, in our judgment the FCC did not abuse its authority when it determined that its cross-interest policy does not apply to this case. CTC cites no judicial or administrative precedent to support its notion that a purely financial interest, unaccompanied by any managerial or voting control, should trigger disqualification of the applicant.[11] Furthermore, we note that even if the Malrite principals were proposing *to own* Channel 19 outright—with 100% ownership of all *voting* stock—the resulting common ownership would not automatically disqualify Channel 19's application under the Commission's rules. Instead, "[s]uch UHF overlap ... cases will be handled on a case-by-case basis in order to determine whether common ownership, operation, or control of the stations in question would be in the public interest." 47 C.F.R. § 73.636 note 8. The regulations therefore manifest a judgment that UHF/radio combinations are not as

**9.** *See supra* note 2. Under Ohio law, as in many jurisdictions, even nonvoting shares have statutory voting rights on questions such as a proposed merger, dissolution, change in the nonvoting stock's par value, or issuance of a new class of preferred stock with priority over the existing preferreds. These voting rights serve only to protect nonvoting shareholders from abuse by voting shareholders; these limited rights do not threaten the ability of voting shareholders to control the management of the corporation.

It is also worth noting that, unlike many nonvoting preferred shares, the Malrite shares do *not* carry contingent voting rights when dividends fall into arrears. *Cf.* D. Herwitz, *Business Planning* 47 (1966) (describing such preferred shares). Such contingent voting rights would present a harder case.

**10.** The preferred shareholders and the common shareholders "shall share ratably, share for share, in any additional dividends declared by the Board of Directors during said calendar year." *Amended Articles of Incorporation of Channel 19, Inc.* art. IV, para. 1, sec. 2, *reprinted in* J.A. at 291. Unlike a lender, who would receive the same payments of principal and interest regardless of the fortunes of the enterprise (so long as it remained solvent), the Malrite preferred shareholders have an additional incentive to foster the success of Channel 19.

Thus, the Malrite interests in Channel 19 are not entirely passive, and this case is not entirely analogous to *Morris, Pierce & Pierce,* 88 F.C.C.2d 713 (Rev.Bd.1981), which involved a *creditor* relationship.

**11.** CTC cites numerous cases that involved ownership or directorship of one station and the occupation of a position as a director, "key employee," or employee with access to confidential information at another station in the same area. *See Barbara S. Uehling,* 78 F.C.C.2d 452 (1980) (common directorship); *Lexington County Broadcasters, Inc.,* 42 F.C.C.2d 581 (Rev.Bd. 1973) (wife of applicant's principal bookkeeper with access to confidential information at another station); *Carolina Broadcasting Co.,* 25 Rad.Reg. (P & F) 515 (1963) (key employee); *Shenandoah Life Insurance Co.,* 19 Rad.Reg. (P & F) 1 (1959) (directorship); *cf. United Community Enterprises, Inc.,* 37 F.C.C.2d 953 (Rev.Bd. 1972) (general manager, station manager and sales manager of station *not* in same area). CTC also cited one case in which the Commission set down for hearing the question whether the owners of the proposed station, four employees of CBS, had a "meaningful relationship," with CBS. *See K & M Broadcasting, Inc.,* 19 F.C.C.2d 947 (Rev.Bd.1967). Finally, CTC cites a case involving ownership of *voting* shares in another broadcast station. *See Rust Craft Broadcasting Co.,* 68 F.C.C.2d 1013 (1978).

generally harmful as other kinds of broadcast combinations. *A fortiori*, the Commission enjoys discretion to determine whether a nonvoting, noncontrolling and nonmanagerial interest in a UHF television station would be contrary to the public interest. The Commission did not abuse that discretion in this case.

## IV. THE COMPARATIVE DETERMINATION

In a comparative proceeding, such as the one now under review, the Commission's task is to choose the contender best able to serve the public interest. *See, e.g., Telocator Network of America v. FCC,* 691 F.2d 525, 545 (D.C.Cir.1982). To structure this assessment, the Commission has set out standard criteria to be considered in every comparative proceeding. *See Policy Statement on Comparative Broadcast Hearings,* 1 F.C.C.2d 393 (1965). Two primary factors determine the Commission's decision: (1) diversification of control, and (2) best practicable service to the public. *See id.* at 394. The "best practicable service" rubric covers the integration of ownership with management, minority ownership, and the local residence, broadcast experience and civic activities of the owners. *See id.* at 395–99.

In this case, the Commission awarded to CTC a "slight diversification preference" due to the media interests held by the Channel 19 principals. *See supra* at 966. However, Channel 19 won a "substantial integration preference." *See supra* at 966. The Board accordingly concluded that "Channel 19's integration preference—and all it bodes for the 'best practicable service' to the public—is sufficiently substantial to overcome CTC's slight diversification preference." 91 F.C.C.2d at 1143. CTC now challenges this ruling in the belief that "the Commission erred as a matter of law in improperly weighing the diversification component in its analysis of the standard comparative criteria." CTC Brief at 40.

In the review of a comparative determination, we must be assured that the agency "has given reasoned consideration to all the material facts and issues" *Central Florida Enterprises, Inc. v. FCC,* 598 F.2d 37, 49 (D.C.Cir.1978), *cert. dismissed,* 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979); *see also Telocator Network of America,* 691 F.2d at 537. Because we think the Commission provided an adequate articulation of its reasons for granting the permit to Channel 19, we reject CTC's challenge.

The facts amply support the award of a "substantial integration preference" to Channel 19, and CTC does not question the validity of the award. Instead, CTC believes that it should have been awarded more than a "slight diversification preference" because of the media holdings of Channel 19's Malrite and Metroplex principals.

We think that the Commission gave an adequate and reasoned basis for its evaluation of the slight diversification preference accorded to CTC. Because the Malrite preferred shares are substantially divested of control rights, the Commission reasonably concluded that "overall diversification of control of the mass media is [not] meaningfully affected by their nominal presence among Channel 19's owners." 91 F.C.C.2d at 1139. Furthermore, the Commission expressly acknowledged the Metroplex holdings as a factor to be counted against Channel 19 in its diversification analysis, but found this adverse factor to be "significantly offset" by CTC's stockholder interest in a Detroit television station. *See* 91 F.C.C. at 1138–39. This comparative treatment of the CTC and Metroplex interests was not unreasonable, considering that CTC's Detroit UHF television station is (1) "in the same type of service [as the proposed station]" and (2) "is more significant as a regional broadcast interest because Detroit is only 100 miles from Cleveland whereas the closest Channel 19 common stockholder-owner broadcast interests are

in Virginia, some 400 miles away." [12] *Id.* at 1139. We therefore uphold the Commis-sion's judgment in its application of its standard comparative criteria.[13]

12. Although the Commission has often recog-nized the "primary significance" of the diversifi-cation factor in its comparative analysis, *see, e.g., FCC v. National Citizens Comm. for Broad-casting,* 436 U.S. 775, 781, 98 S.Ct. 2096, 2105, 56 L.Ed.2d 697 (1978); Policy Statement on Com-parative Broadcast Hearings, 1 F.C.C.2d 393, 395 (1965), it does not follow that *any* diversifi-cation preference should prevail over a stronger integration preference, *see, e.g., Gilbert Broad-casting Co.,* 91 F.C.C.2d 450 (1982); *CJL Broad-casting, Inc.,* 88 F.C.C.2d 750 (Rev.Bd.1981). In this case, the Commission reasonably deter-mined that "Channel 19's integration prefer-ence—and all it bodes for the 'best practicable service' to the public—is sufficiently substantial to overcome CTC's slight diversification advan-tage and to warrant [the] affirmance of the ALJ's ultimate conclusion that a grant of Chan-nel 19's application will better serve the public interest, convenience, and necessity." 91 F.C. C.2d at 1143.

13. After oral argument, CTC asked the Commis-sion to seek a remand of the proceedings in this case. *See* Letter to Bruce E. Fein, General Counsel for FCC, from David G. Rozzelle, Coun-sel for CTC (March 5, 1984). CTC wanted the Commission to reexamine its comparative li-censing decision in light of alleged inaccuracies in reporting by a Florida radio station, WHYI, which is owned by Metroplex, a Channel 19 principal. These alleged inaccuracies had sur-faced during a proceeding to renew the Florida station's license. *See* Metroplex Communica-tions of Florida, Inc., FCC 84-71 (March 9, 1984) [hereinafter "Hearing Designation Or-der"]. Ten days after CTC made its request, FCC General Counsel Fein informed CTC that the Commission would not seek the requested remand. *See* Letter to David G. Rozzelle from Bruce E. Fein (March 15, 1984). In response, CTC itself filed a motion for remand with this court, which was subsequently opposed by both Channel 19 and the Commission. *See* CTC Mo-tion for Remand (March 21, 1984).

In the *Metroplex Communications of Florida* proceeding, the Commission set down for hear-ing the issue whether station WHYI had acted with the requisite candor in making reports to the FCC on its employment policies and prac-tices. *See* Hearing Designation Order ¶ 31, at 10–11. According to CTC, the designation of this issue for hearing in the Florida proceeding raises such substantial doubts about the proprie-ty of granting a license to Channel 19 that a remand of this case is necessary.

We recognize, and the Commission acknowl-edges, that the allegations concerning WHYI's lack of candor might have been material to this proceeding. *See* FCC Response to CTC Motion for Remand at 4–5 (April 4, 1984). However, to necessitate a remand in the face of agency oppo-sition, a party must show a change in "core" circumstances, going to "the very heart of the case." *Greater Boston Television Corp. v. FCC,* 463 F.2d 268, 283 (D.C.Cir.1971), *cert. denied sub nom. WHDH, Inc. v. FCC,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); *see also American Optometric Ass'n v. FTC,* 626 F.2d 896, 906–07 (D.C.Cir.1980); *Frontier Airlines, Inc. v. CAB,* 602 F.2d 375, 377–78 (D.C.Cir.1979) (per curiam). We do not think that the designation of the issues in the Florida case constitutes such an important change in circumstances.

To begin with, the Hearing Designation Order casts only a speculative shadow of doubt upon the candor of Wain and Weiss, the Metroplex principals involved in Channel 19. The order merely identifies the candor issue for hearing; accordingly, it represents an *allegation,* not a *showing* that WHYI engaged in improper ac-tion. Furthermore, while CTC alleges that Wain and Weiss signed some relevant reports, it of-fers no evidence to implicate Wain or Weiss personally in knowing or willful provision of false information to, or purposeful withholding of information from, the Commission. Neither does the Hearing Designation Order charge Wain or Weiss with such misconduct. Indeed, according to the Commission, the preliminary evidence indicates that the alleged misconduct was "limited to [WHYI], and does not affect Metroplex's general qualifications to hold licens-es for other stations." FCC Response to CTC Motion for Remand at 4 (April 4, 1984).

We also note that the candor issue was raised in the *Metroplex Communications of Florida* proceeding on December 31, 1981, over four months before the ALJ's initial decision in this case, over nine months before the Review Board's decision, and over sixteen months be-fore the Commission's denial of review. *See* FCC Response to CTC Motion for Remand at 5 n. 9 (April 4, 1984); Letter to Bruce E. Fein from David G. Rozzelle at 4 n. 2 (March 5, 1984). Much of the information upon which CTC now relies was therefore apparently avail-able during the administrative proceeding in this case. We believe that, instead of showing a true change in core circumstances, CTC's peti-tion seeks primarily to gain an opportunity to present additional evidence concerning prior circumstances. *See Greater Boston,* 463 F.2d at 283 n. 25.

Finally, if the Florida proceeding eventually reveals that Wain and Weiss were in fact re-sponsible for misrepresentations or lack of can-dor, the Commission could at that time take corrective action. At stake in this case is Chan-nel 19's construction permit, and the Commis-sion has the authority to deny a final operating license if a "cause or circumstance arising or first coming to the knowledge of the Commis-sion since the granting of the permit would ... make the operation of such station against the public interest." 47 C.F.R. § 1.68 (1983). In addition, the Commission could revoke Channel 19's license or permit, *see* 47 U.S.C. § 312(a), or

974

### V. CONCLUSION

For the reasons set forth above, the order of the Commission is

*Affirmed.*

designate for hearing the station's renewal application, *see id.* § 307(c).

Accordingly, we deny CTC's motion for a remand in this case.