Susan M. BECHTEL, Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Anchor Broadcasting Limited
Partnership, Intervenor.

GALAXY COMMUNICATIONS,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Appellees,

Anchor Broadcasting Limited
Partnership, Intervenor.

Nos. 91–1112, 91–1116.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 25, 1991.

Decided Jan. 31, 1992.

Barry D. Wood, with whom Ronald D. Maines, Washington, D.C., was on the brief, for appellant Galaxy Communications, Inc., in 91–1116.

Gene A. Bechtel, Washington, D.C., for appellant Susan M. Bechtel in 91–1112.

David Silberman, Counsel, F.C.C., with whom Robert L. Pettit, Gen. Counsel, and Daniel M. Armstrong, Associate General Counsel, Washington, D.C., were on the brief, for appellee in 91–1112 and 91–1116.

Lewis I. Cohen and Roy W. Boyce, Washington, D.C., were on the brief for intervenor Anchor Broadcasting Limited Partnership in both cases.

Before WALD, SILBERMAN, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Two unsuccessful applicants for a new FM radio station appeal an FCC grant of the license to their competitor Anchor Broadcasting Limited Partnership. One key criterion upon which the Commission relied to award the license to Anchor was Anchor's degree of "integration" of ownership into management. Galaxy Communications, Inc.'s primary challenge is to the *bona fides* of Anchor's integration proposal, whereas Susan M. Bechtel contends that regulatory changes since 1965, when the Commission first formally adopted the integration criterion, have made its continuing use arbitrary and capricious. We reject Galaxy's claims but think the Commission is obliged openly to confront Bechtel's challenge. We therefore remand to the Commission so that it may do so.

### I.

In considering competing applications for a radio license, the FCC is charged with determining which of the competing applications would best serve "the public interest, convenience, and necessity." 47 U.S.C. § 309(a). The Commission has long structured these determinations according to its 1965 *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393 (1965) (*1965 Policy Statement*). In the *1965 Policy Statement*, the Commission defined the public interest in terms of two broad objectives: providing the "best practicable service to the public" and securing the "maximum diffusion of control of the media of mass communications." *Id.* at 394. The *1965 Policy Statement* set forth a list of six principal factors (not necessarily exclusive) that it said furthered these objectives. *See id.* at 394–99.

Two of these factors, integration of ownership into management and efficient use of frequency, or comparative coverage, are implicated in this case. By integration, the FCC means the full-time participation by owners of a radio station in its management. For purposes of calculating the degree of credit an applicant gets for integration, the FCC measures the percentage of total ownership in the hands of full-time

managers. *See id.* at 395. Comparative coverage, on the other hand, focuses on the engineering proposals for the station itself. *See id.* at 398–99. Normally, the FCC will prefer an applicant whose proposed signal will reach a larger geographic area or a larger listening population. *See, e.g., Susan S. Mulkey*, 4 F.C.C.R. 5520, 5523 (1989).

In recent years, the FCC has permitted applicants to gain full credit for integration notwithstanding the presence of passive owners so long as those owners are sufficiently insulated from station business and "have no authority to control the licensee." *Anax Broadcasting Inc.*, 87 F.C.C.2d 483, 488 (1981). *See generally Attribution of Ownership Interests*, 97 F.C.C.2d 997, 1021 (1982), *on reconsideration*, 58 Rad.Reg.2d (P & F) 604, 613–20 (1985), *further clarified*, 1 F.C.C.R. 802 (1986). This permits applicants to attract capital from passive investors without sacrificing the opportunity to gain full integration credit.

In this case, four applicants filed mutually exclusive proposals for a new, low power, FM commercial radio license to serve approximately 35,000 people in Selbyville, Delaware, and Ocean City, Maryland. The successful partnership, Anchor, consists of four partners, three limited and one general, all of whom own equal shares and have been close friends for 25 years. All four are black. None has ever resided in the service area of the proposed station, and none has any prior experience operating a radio station. The general partner, Dr. Herman Stamps, is a retired dentist who has not worked since his retirement. For the past several years, he has traveled abroad several times a year and maintained three residences along the eastern seaboard, as well as a yacht. Dr. Stamps testified that if awarded the license, he would move his permanent residence to Selbyville and work full time during the week at the station as its general manager. In addition, he and his partners pledged in writing that the limited partners would exercise no control over the operations of the station and would not participate in its management. Under Anchor's engineering

proposal, the Selbyville station would reach 33,350 people over 920 square kilometers.

Appellant Galaxy is a corporation owned entirely by Alexander Soroka, a retired employee of Westinghouse with no previous broadcasting experience. He is chairman and president of the corporation, and Gregory Walls, who is the controller of a broadcasting company, serves as secretary-treasurer and a director. Mr. Soroka moved to Selbyville around the time he filed his application and claimed 100% integration credit based on his promise to spend at least 40 hours per week working as the full-time general manager of the station. Mr. Soroka denied that his son, a radio engineer, or Mr. Walls would exert substantial influence on his operation of the station. Galaxy's engineering proposal would serve a population of 39,753 over 1,192 square kilometers.

The other appellant, Susan M. Bechtel, whose husband is an experienced communications attorney, lives in Potomac, Maryland, but has vacationed in the proposed service area—where she has a summer house—for approximately 40 years. She, like Dr. Stamps and Mr. Soroka, has no broadcasting experience, but she did not propose to manage the day-to-day operations of the station herself and so did not claim integration credit; rather, she stated that she would hire an experienced general manager to run the station under her general supervision. Ms. Bechtel would consult with her husband and with other friends who are experienced broadcasters. Under her engineering proposal, the station would serve 40,465 people over 1,200 square kilometers.[1]

Although Bechtel was clearly superior to Anchor regarding comparative coverage, serving approximately 21% more people, the ALJ thought Bechtel entitled to only a " 'very slight' " preference, because the absolute number of people involved was small and the service area was already well served by five or more stations. *See Anchor Broadcasting Limited Partnership*, 4 F.C.C.R. 5687, 5691 (ALJ 1989) (quoting *Resort Broadcasting Co., Inc.*, 41 F.C.C.2d 640, 647 (Rev.Bd.1973)). This factor was overwhelmed by the 100% integration credits awarded to both Anchor and Galaxy. The Administrative Law Judge (ALJ) found that the evidence in the record suggested that the principals of both applicants would follow through on their promises to move to Selbyville and work full time at the station, without communication from or control by their passive investors or family members. *See id.* at 5691–92. The resulting tie between Anchor and Galaxy was broken in Anchor's favor largely because Anchor's owners were black.[2] *See id.* at 5692.

The Review Board reversed the ALJ's award of the station to Anchor, awarding it instead to Galaxy. *See Anchor Broadcasting Limited Partnership*, 5 F.C.C.R. 2432 (Rev.Bd.1990). The Board found that Anchor had failed to carry its burden to establish the reliability of its integration proposal. Dr. Stamps' pledge to move to Selbyville and work full time at the station was thought difficult to reconcile with evidence of his ownership of several homes, his unwillingness to commit to selling any of them, and his lack of a home in Selbyville. *See id.* at 2437. The Board also said that "the record here is decidedly unpersuasive

1. The fourth applicant, Selbyville Broadcasting Co., Inc. (SBC), did not seek review. To provide context, we note that SBC was a corporation whose sole owner and officer was Rita Capobianchi. Ms. Capobianchi is a 25% owner of her husband's communications consulting engineering firm and works full time as its director of operations. She has no broadcasting experience and lives with her family, including three school-aged children, in suburban Maryland. SBC claimed credit for 100% integration. In the event her application were granted, Ms. Capobianchi promised that she would resign her position in her husband's company, move to Selbyville, and work at the station full time as

its general manager, possibly returning to her family on weekends. Her husband would not have provided advice or assistance in operating the station. SBC's engineering proposal would have provided coverage to 33,644 people over 931 square kilometers.

2. The quantitative integration credit may be qualitatively enhanced by a variety of factors, one of which is race. *See West Michigan Broadcasting Co. v. FCC,* 735 F.2d 601, 604–07 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 782 (1985).

that Anchor's limited partners intended to be barred absolutely from substantive communications about station management, or are likely to remain wholly insulated in practice." *Id.* at 2436. Portions of the record indicated that the three limited partners had been "keenly active" with respect to a previously applied-for FM facility, and one had manifested a lack of awareness of the provision in the limited partnership agreement prohibiting communications with Dr. Stamps about station business. *Id.* at 2436–37. The Board also pointed to passages from the record that suggested some of Dr. Stamps' responses to questions about insulation were crafted for hearing purposes only.[3] *See id.* at 2437. The Review Board noted Ms. Bechtel's "unorthodox exceptions" regarding the continued viability of the integration criterion but did not address them, saying only that it lacked authority to grant the relief she sought. *Id.* at 2439 n. 3.

The Commission reversed the Review Board and reinstated Anchor as the victorious applicant, determining that the record as a whole adequately supported the ALJ's conclusion that the limited partnership was *bona fide* and that the partners understood their various promises and obligations and intended to fulfill them. *See Anchor Broadcasting Limited Partnership,* 6 F.C.C.R. 721, 722 (1991). The Commission addressed and rejected Ms. Bechtel's argument that the "preference for integration is discredited and should not be applied in this proceeding" in a footnote. *See id.* at 724 n. 4. It stated that "Anchor's principal is committed to fulfilling his integration commitment.... In any event, such a change in the comparative criteria would more ap-

propriately be considered in a rule making proceeding." *Id.* Galaxy and Bechtel then appealed to this court.

## II.

■ Galaxy's principal challenge[4] to the FCC's decision is that the Commission's award of 100% integration credit to Anchor "cannot be squared with any reasonable construction of the record evidence." Galaxy argues that the FCC is bound under its precedents to find that Anchor's proposal was a sham, both because Dr. Stamps will not serve as a full-time manager of the station and because his limited partners will not be insulated sufficiently from station business to qualify for exemption from ownership attribution under the Commission's rules. Essentially, Galaxy urges upon us the same analysis of the record that the Review Board accepted. But we owe deference to the Commission's determination, not to that of the Review Board, especially where, as here, the Commission's views of factual and credibility issues accord with those of the ALJ. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496–97, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951).

■ Under Commission integration rules, a station owner is integrated into management when his involvement amounts to "full-time active participation in day-to-day operations," *Berryville Broadcasting Co.,* 70 F.C.C.2d 1, 6–7 (Rev.Bd. 1978), and his limited partners are sufficiently insulated to be excluded from the integration calculation if they exert "no influence or control over the licensee" and

---

3. For instance, when asked how he expected his relationship with his partners to work, Dr. Stamps responded, "Well, I am afraid to answer that question because I know what is expected of me by law.... I mean there's a real world, and then there's this. Right here I am going by this." Asked whether he expected to converse with his partners about station affairs, Dr. Stamps added, "I don't know which amendment there is about possible self-incrimination, but I certainly wouldn't answer 'yes'."

4. Galaxy's claim that Anchor's minority preference was unconstitutional, notwithstanding *Metro Broadcasting, Inc. v. FCC,* —— U.S. ——, 110

S.Ct. 2997, 111 L.Ed.2d 445 (1990), because it was the dispositive factor in Anchor's licensing victory in this case was not raised before the Commission, so we may not consider it. *See* 47 U.S.C. § 405(a); *Southern Indiana Broadcasting, Ltd. v. FCC,* 935 F.2d 1340, 1342 (D.C.Cir.1991). And its contention that the FCC should have broadened the hearing to determine whether Anchor's partners had truthfully represented that they had an oral agreement to contribute sufficient funds to finance the construction and operation of the station seems to us to be without any merit.

have no material involvement in station management or operation. *Ownership Attribution*, 97 F.C.C.2d at 1022–23. The applicant advancing an integration proposal carries the burden of allaying any substantial doubts that may arise concerning the likelihood of effectuating his proposal. *See Knoxville Broadcasting Corp.*, 103 F.C.C.2d 669, 687 (Rev.Bd.1986).

 When considering integration proposals, the Commission focuses upon actual, not nominal, patterns of control and involvement. *See Royce Int'l Broadcasting*, 5 F.C.C.R. 7063, 7064 (1990). But to raise a substantial doubt about whether the nominal control established in a partnership agreement is *bona fide*, a person challenging an integration proposal bears a burden of production: a written agreement will not ordinarily be disregarded absent evidence that the agreement has been ignored or is otherwise a sham. *See KIST Corp.*, 102 F.C.C.2d 288, 291 n. 8 (1985), *aff'd mem. sub nom. United American Telecasters, Inc. v. FCC*, 801 F.2d 1436 (D.C.Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 839 (1987); *Cleveland Television Corp. v. FCC*, 732 F.2d 962, 969 (D.C.Cir.1984).

 The FCC concluded that the written covenants in Anchor's limited partnership agreement and the testimony of the Anchor partners established *de jure* legal authority consistent with FCC integration and insulation requirements and a credible commitment to act in accordance with that authority. This determination is supported by substantial evidence on the whole record. All of the Anchor partners testified candidly, according to the Commission, and all testified that they would carry out their promises pertaining to integration. Dr. Stamps pledged to move to Selbyville and manage the station, and his limited partners promised they would not talk about station business with him and would not be involved in the day-to-day operations of the station. The portions of testimony Galaxy relies on to contradict these representations are, for the most part, either irrelevant or subject to more than one reasonable interpretation.[5] Notwithstanding Galaxy's suggestion at oral argument that we review the FCC's inferences and conclusions based on this record *de novo*, we accord substantial deference to the Commission's resolution of factual disputes and credibility questions. *See WEBR, Inc. v. FCC*, 420 F.2d 158, 160, 162–63 (D.C.Cir. 1969). Galaxy's challenge really goes to the credibility of Anchor's partners, and the ALJ who heard them testify chose to believe their explicit promises to operate the station in a fully integrated fashion.[6]

Nor is the FCC's award of full integration credit to Anchor inconsistent with Commission precedent. The cases cited to us by Galaxy, in which the Commission denied integration credit, involved much stronger evidence that an integration proposal was fictional. For example, in *Doylan Forney*, 3 F.C.C.R. 6330 (Rev.Bd.1988), *rev. denied*, 5 F.C.C.R. 5423 (1990), one

---

**5.** That the four Anchor partners are close friends who previously sought a broadcast license as full partners, for example, could, as Galaxy argues, suggest that they will collaborate in running the station and speak of station business when they see each other socially. But one could equally regard the friendship and the prior venture as irrelevant if one credits the partners' testimony that they intend to abide by the insulation provision in the limited partnership agreement. Similarly, Dr. Stamps' discussion of his Virginia domicile and tax status could be thought to belie his claim that he intends to move to Selbyville permanently if awarded the license, but one could also interpret Dr. Stamps' testimony as pertaining only to his *current* living arrangements. And Dr. Stamps' allusions to the privilege against compulsory self-incrimination and to differences between the "real world" and the partnership agreement can reasonably be regarded as the overly careful responses of a witness worried about unforeseen hypotheticals during cross-examination.

**6.** Galaxy also claims that an oral side agreement on financing between the Anchor partners destroys limited liability under Delaware partnership law and requires the Commission to treat the Anchor partnership agreement and the promises it contains as a nullity; however, the Commission's judgment that an integration proposal is *bona fide* does not depend on "the formalities of state law." *Signal Ministries, Inc.*, 104 F.C.C.2d 1481, 1494 (Rev.Bd.1986), *rev. denied*, 2 F.C.C.R. 1259 (1987), *aff'd mem. sub nom. Adelphi Broadcasting Corp. v. FCC*, 838 F.2d 571 (D.C.Cir.1988); *see also Marlin Broadcasting v. FCC*, 952 F.2d 507, 512 (D.C.Cir.1992).

applicant's limited partners were Washington communications attorneys who had initiated and prosecuted the applications from start to finish, and the managing partner, a Ms. Arroyo–Duron, had almost no knowledge of the partnership agreement, the business plan, the budgets, or her anticipated role in the organization. *See id.* at 6331–32. With regard to another applicant, the limited partners enjoyed exclusive power to terminate the partnership by simple majority vote, without the concurrence of the general partners. *See id.* at 6332. And in a third, a 49% voting shareholder who proposed to run the station full time was a 21–year–old housekeeper with no prior business experience who had not participated in any of the important decisions regarding the application and who had little knowledge of what running a radio station entailed. *See id.* at 6333. Here, Dr. Stamps, the general partner, was in full control of the application, and we see no evidence indicating that he is merely a front for his limited partners.

Similarly, the cases Galaxy relies on for the proposition that the FCC must deny Anchor integration credit because Dr. Stamps' lifestyle is inconsistent with his proposed full-time employment involve much weightier evidence that the "integrated" partner's commitment was inconsistent with other prior obligations, which made it factually or legally impossible to credit the applicants' representations that they would work full time at the station. *See, e.g., Leninger–Geddes Partnership*, 2 F.C.C.R. 3199, 3199–3200 (Rev.Bd.1987), *rev. denied*, 3 F.C.C.R. 1181 (1988); *Knoxville Broadcasting Corp.*, 103 F.C.C.2d 669 (Rev.Bd. 1986). No one disputes Dr. Stamps' ability to adhere to his commitments to work full time in Selbyville, if he so wishes.

We therefore conclude that the Commission was entitled to credit Anchor's integration proposal.

### III.

■ The FCC explained its adoption of the integration criterion in the *1965 Policy Statement* by saying that radio service to the public would be enhanced by merging "legal responsibility and day-to-day performance." *1965 Policy Statement*, 1 F.C.C.2d 393, 395 (1965). The FCC predicted that the programming of a station with integrated management would reflect "greater sensitivity to an area's changing needs, and [would be] designed to serve those needs." *Id.* The Commission has never explained this further, either in the *1965 Policy Statement* or at any time thereafter, including in this proceeding. The Commission has not spelled out *why* an owner/manager will be more sensitive to community needs than an owner who hires a professional manager. It might be thought that an owner/manager would likely live in the community being served, but the integration credit is awarded whether or not the owner/manager lives in the community.[7] And a professional manager is no less likely to live in the community served by his station than is an owner/manager.

Nonetheless, Ms. Bechtel does not challenge the adequacy of the original justification for the integration criterion. Instead, she contends that, assuming it was reasonably developed, the integration criterion no longer serves its stated objectives. According to Ms. Bechtel, subsequent regulatory events have made the Commission's continued emphasis on "integration" arbitrary and capricious.

In 1981 the Commission began to exempt passive owners from the integration calculation if the passive owners agreed to exert no influence or control over the licensee. *See Anax Broadcasting, Inc.*, 87 F.C.C.2d at 488. *See generally Attribution of Ownership Interests*, 97 F.C.C.2d at 1021, *on reconsideration*, 58 Rad.Reg.2d (P & F) 604, 613–20 (1985), *further clarified*, 1 F.C.C.R. 802 (1986). This made it possible for an applicant to receive 100% credit for integration of ownership into management even when, as with Anchor, only a fraction

---

**7.** To be sure, the integration credit can be qualitatively enhanced if the owner/manager lives in the community, *see 1965 Policy Statement*, 1 F.C.C.2d at 395–96, but its basic rationale cannot depend on that factor since it operates independently of the owner's residence.

of total ownership was actually represented in management. The following year, the Commission began to permit licensees to sell their stations without a hearing after operating them for only a year. *See* 47 C.F.R. § 73.3597(a); *Transfer of Broadcast Facilities*, 52 Rad.Reg.2d (P & F) 1081, 1086–87 (1982). At the time the *1965 Policy Statement* was adopted, the minimum holding period was three years, *see Applications for Voluntary Assignments or Transfers of Control*, 32 F.C.C. 689, 692 (1962), and the Commission had explicitly noted "it is important that integration proposals be adhered to on a permanent basis." *1965 Policy Statement*, 1 F.C.C.2d at 395 n. 6.

After these changes, an applicant largely financed by passive investors, but who promised to manage the station, could qualify for full integration credit, get the license for that reason, and then, after only a year, turn around and sell it to anyone without regard to the buyer's "integration" or lack thereof. Whatever the original rationale supporting the integration criterion, these two regulatory changes would, therefore, appear to eviscerate it.

Taken together, these developments induce what Ms. Bechtel characterizes as "shotgun marriage[s] of the most tenuous kind" between people with capital and people promising to run a station full time. These marriages, Ms. Bechtel points out, do not last. Lured by the prospect of the quick profits to be made from selling the station after a year, when its market value often far exceeds the costs sunk into acquiring and constructing it, speculators organize special corporations or partnerships to compete for a particular license and then sell out as quickly as possible to professional broadcasters. Even when integration proposals are not "shams" in the sense that applicants are lying about their intentions or that passive or silent partners are truly in control, Ms. Bechtel argues that the proposals frequently involve "strange and unnatural" business arrangements. In our case, for example, best friends and co-owners of a station swear not to consult with each other; family members with valuable broadcast knowledge and experience agree not to assist the tyro station manager in the family; people with steady jobs and families in one city pledge to leave them and move permanently to another; and wealthy retirees promise to move to and work in small summer towns in Delaware with which they have no former connection. The case of *Debra D. Carrigan*, in which, according to Ms. Bechtel, the successful integrated applicant contracted within five months to sell the station for over $4 million to a group broadcaster, is allegedly but one illustration of the end result. *See Debra D. Carrigan*, 100 F.C.C.2d 721 (Rev.Bd.1985), *rev. denied*, 104 F.C.C.2d 826 (1986), *aff'd sub nom. Bernstein/Rein Advertising, Inc. v. FCC*, 830 F.2d 1188 (D.C.Cir.1987).

In these proceedings, Ms. Bechtel has asked the Commission to explain its continued adherence to the integration criterion in light of these regulatory changes and to consider whether her proposal to build a station that would serve 21% more people and to hire a professional station manager to run it would serve the public interest better than her competitors' integrated proposals. This the Commission has consistently refused to do. She challenged both the FCC and her competing applicants to point to any cases, over the last 10 years, in which a licensee prevailed in a comparative hearing based upon its integration proposal and then actually constructed and operated the station in conformity with that proposal for a period substantially exceeding one year. Neither the FCC nor her competitors offered a single example. Indeed, during the approximately 26 years in which the integration of ownership into management has been an important criterion in comparative licensing proceedings, there is no instance of which we are aware in which the FCC has publicly examined its effectiveness.

The only response to Ms. Bechtel's serious arguments was presented in a footnote at the final level of Commission review. But the footnote did not address the substance of her argument that the criterion itself was flawed; it said only that the criterion had been applied properly in this

case and that any reconsideration of the criterion "would more appropriately be considered in a rule making proceeding." *Anchor Broadcasting Limited Partnership,* 6 F.C.C.R. at 724 n. 4. On appeal, the FCC has defended the integration criterion by insisting in conclusory fashion that "[t]he *Policy Statement* was designed to bring order, clarity and consistency to the comparative process." Given Ms. Bechtel's contention that the reality of the current regulatory environment is at odds with whatever policy originally supported integration preferences, she is entitled to a fuller explanation.

The FCC nevertheless argues that it is under no duty to explain its continued adherence to settled policy; it claims that it must only explain *changes* in policy or departures from prior precedent. While the Commission is correct that changes of policy require a rational explanation, it is also true that changes in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so. In the rulemaking context, for example, it is settled law that an agency may be forced to reexamine its approach "if a significant factual predicate of a prior decision ... has been removed." *WWHT, Inc. v. FCC,* 656 F.2d 807, 819 (D.C.Cir.1981); *see also American Horse Protection Ass'n v. Lyng,* 812 F.2d 1, 5 (D.C.Cir.1987); *Geller v. FCC,* 610 F.2d 973, 979 (D.C.Cir.1979) (per curiam). The Commission's duty is even more pressing when the policy is embodied not in a binding regulation issued after public notice and comment but in a general statement of policy such as the *1965 Policy Statement* at issue here. *See Pacific Gas & Elec. v. FPC,* 506 F.2d 33, 38–40 (D.C.Cir.1974). The Commission's necessarily wide latitude to make policy based upon predictive judgments deriving from its general expertise, *see FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 814, 98 S.Ct. 2096, 2121–22, 56 L.Ed.2d 697 (1978), implies a correlative duty to evaluate its policies over time to ascertain whether they work—that is, whether they actually produce the benefits the Commission originally predicted they

would. *Cf. FCC v. WNCN Listeners Guild,* 450 U.S. 582, 603, 101 S.Ct. 1266, 1278–79, 67 L.Ed.2d 521 (1981) ("[T]he Commission should be alert to the consequences of its policies and should stand ready to alter its rule if necessary to serve the public interest more fully."). As we have previously said:

> When the agency applies [a general] policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.

*Pacific Gas,* 506 F.2d at 38–39.

Accordingly, the Commission must demonstrate why its focus on integration is still in the public interest, if indeed the Commission concludes that it is. Although FCC counsel at oral argument told us that the Commission is currently rethinking the issue of integration of ownership and management on its own initiative, *Pacific Gas* makes clear that the Commission must nonetheless be prepared to explain and justify general policies not embodied in a regulation when they are properly challenged in a specific case. *See id.* The cases relied on by the FCC for the proposition that it can refuse to address Ms. Bechtel's arguments in this proceeding are not on point. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), and *New York State Commission on Cable Television v. FCC,* 749 F.2d 804 (D.C.Cir. 1984), merely stand for the proposition that an agency may, in its discretion, choose to make new policy through either rulemaking or adjudication. *See Bell Aerospace,* 416 U.S. at 294, 94 S.Ct. at 1771–72; *New York State Comm'n,* 749 F.2d at 815. We do not question that discretion; we are not directing the Commission to use a particular procedural mode or even to use any at all. We are simply instructing the FCC to respond to Ms. Bechtel's challenges and to consider her application in light of those challenges. If the Commission decides it wishes to change its policy, whether at Ms.

Bechtel's urging or that of its staff, it is free to do that however it wishes.

*It is so ordered.*