**USA INTERACTIVE, et al, Plaintiffs,**

v.

**DOW LOHNES & ALBERTSON, P.L.L.C., et al, Defendants.**

**No. 8:02–CV–1259T30EAJ.**

United States District Court, M.D. Florida, Tampa Division.

Aug. 4, 2004.

---

Alice G. Hector, Akerman Senterfitt, Miami, for USA Interactive, a Delaware corporation, Home Shopping Network, Inc., a Delaware corporation, USA Broadcasting Inc, a Delaware corporation, SK Holdings, Inc., a Delaware corporation, Plaintiffs.

Morris Weinberg, Jr., Jack E. Fernandez, Jr., Robert R. Hearn, Marcos E. Hasbun, Zuckerman Spaeder, L.L.P., Tampa, for Dow Lohnes & Albertson, P.L.L.C., John Feore, individually, Defendants.

## *ORDER*

MOODY, District Judge.

THIS CAUSE comes before this Court upon:

1. Defendants' Renewed Motion in Limine (Dkt.# 119), Plaintiffs' response (Dkt.# 173), and Defendants' reply (Dkt.# 189) thereto;

2. Plaintiffs' Motion for Summary Judgment (Dkt.# 120), Defendants' response (Dkt.# 181), and Plaintiffs' reply (Dkt.# 192) thereto;

3. Defendants' Motion for Summary Judgment on Standing (Dkt.# 123), Plaintiffs' response (Dkt.# 175), and Defendants' reply (Dkt.# 194) thereto; and

4. Defendants' Motion for Summary Judgment on Causation (Dkt.# 124), Plaintiffs' response (Dkt.# 179), and Defendants' reply (Dkt.# 193) thereto.

## I. INTRODUCTION

This action arises out of alleged transactional legal malpractice and follows a lengthy, costly litigation battle between the parties to that transaction. More specifically, Plaintiffs allege that Defendants breached their fiduciary duties to Plaintiffs and negligently drafted an option in a manner that made that option not exercisable. This case presents a unique set of circumstances not normally seen in legal malpractice cases because it is undisputed that the lawyer who drafted the option disclosed to the client that the option was not exercisable and would not be exercisable unless a change in the regulatory regime occurred. Unfortunately for the clients, the regulatory agency took longer than anticipated, approximately ten years, reviewing the relevant policy before repealing it. In the interim, the client unsuccessfully tried to exercise the option. After close consideration, this Court concludes that summary judgment is appropriate.

## II. BACKGROUND

Plaintiff Home Shopping Network, Inc. ("HSN") is a television network located in St. Petersburg, Florida. Beginning in 1986, HSN hired Defendants John Feore and Dow Lohnes & Alberson, P.L.L.C. ("DLA") (collectively Feore and DLA are referred to as "Defendants") to represent HSN and its subsidiaries in a series of transactions designed to expand HSN's broadcast distribution system through the acquisition of interests in and affiliations of television stations throughout the United States.

### A. HSN–JOVON–VILLANUEVA

In 1989, HSN attempted to obtain an interest in Jovon Broadcasting, Inc. ("Jovon"), which owned a construction permit to build a television station in Hammond, Indiana (in Chicago's designated market area), in exchange for financing the construction of that station. In June 1989, HSN sent a letter of intent to Jovon, but no agreement was ever reached because Jovon decided to obtain financing from another source, a man named Villanueva. During the time that negotiations between HSN and Jovon occurred, Defendants represented HSN.[1]

After the discussions between Jovon and HSN ended, Jovon retained Defendants to represent it in its negotiations with Villanueva. On July 29, 1989, Joseph Stroud, Jovon's president, signed an engagement letter with Defendants detailing that representation. Defendants also soon there-

---

1. Defendants level of involvement in and knowledge of the initial proposed transaction is not entirely clear from the record.

after began representing Jovon before the Federal Communications Commission (the "FCC"). Defendants also continued representing HSN on other matters. In August 1989, the Villanueva*Jovon transaction closed.

## B. HSN*JOVON TRANSACTION

In the spring of 1990, Villanueva breached his agreement with Jovon by failing to provide certain financing for the construction of the station. Stroud contacted HSN about reviving the HSN*Jovon transaction and negotiated a financing*equity deal. In April 1990, HSN forwarded a term sheet for the HSN*Jovon proposed transaction to Defendants with a request that Defendants draft the documents for the transaction. At this same time, Defendants also began negotiating on behalf of Jovon to terminate the Villanueva*Jovon agreement.[2]

On June 22, 1990, Defendants sent a letter to Jovon, requesting Jovon waive any conflict caused by its representation of HSN in the HSN*Jovon transaction. The letter proposed that Defendants would continue to represent Jovon in terminating the Villanueva*Jovon Agreement and in its FCC matters.[3] The letter made clear that Defendants were not representing Jovon in the HSN*Jovon transaction. Stroud signed and returned the letter to Defendants as understanding and approving Defendants' representation of HSN in the HSN*Jovon transaction. No similar letter

exists with respect to HSN. But prior to the waiver letter, Defendants orally discussed and disclosed the representations of HSN and Jovon with HSN's then president, Lowell "Bud" Paxson.[4] Paxson approved Defendants representation of Jovon in terminating the Villanueva*Jovon agreement and in Jovon's FCC matters.

Jovon hired a transactional lawyer, John Starbuck, to represent it in the HSN*Jovon transaction. Starbuck had no experience in FCC matters. Despite having a lawyer, Stroud at times communicated with Defendants directly regarding the HSN*Jovon transaction. Those he spoke with often were the same lawyers at DLA representing him in the termination of the Villanueva*Jovon transaction.

The HSN*Jovon transaction called for HSN to provide a secured loan of $3.6 million to construct the station.[5] In exchange for the loan, Jovon would: (a) enter into an affiliation agreement with HSN under which Jovon's station would play twenty-two hours of HSN programing a day, except on Sundays; (b) grant HSN a secured interest in most of Jovon's assets; and (c) grant an option to purchase a nonvoting common stock interest in Jovon.[6] Defendants drafted the transaction documents. On August 7, 1990, the HSN/Jovon transaction closed.

## C. THE OPTION AND SHAREHOLDER AGREEMENT

This action concerns Defendants' drafting of the option agreement. As additional

---

**2.** Termination of the Villanueva*Jovon agreement was a condition precedent of any deal between HSN and Jovon.

**3.** These matters included periodic reporting to and lobbying activities at the FCC.

**4.** Similar discussions also occurred with Jovon.

**5.** In actuality, part of the money was going to be used to repay monies loaned by Villanueva.

**6.** Jovon's shareholders also entered into a pledge agreement.

consideration for the HSN/Jovon loan, an HSN affiliate, Plaintiff HSN Communications, Inc., which is now known as Interactive Corp. ("Interactive"), acquired an option to purchase a forty-five percent non-voting stock interest in Jovon.[7] The option was between Interactive and Jovon and the Strouds (the then sole shareholders of Jovon). In order to exercise the option, Interactive had to tender $45,000.00 to Jovon.

Several provisions of the option are relevant to this dispute. First, the option existed until the later of the termination of the loan agreement or the expiration of the initial term of the affiliation agreement.[8] In addition to the possibility that the option could expire, the option would terminate if certain events occurred, including "any judgment, decree, or order that would prevent or make unlawful the Closing" of the option on the closing date.

Next, Interactive had the right to assign the option. However, if Interactive assigned the option to any non-affiliated entity (of Interactive), then the Strouds would have a right of first refusal to purchase the option on the same terms and conditions as the third party. The option did not include severability or reformation clauses.

In July 1990, prior to closing, Defendants informed HSN and Interactive in writing that then existing FCC policy prohibited any HSN affiliate from owning any interest in the Jovon station because of the cross-interest policy.[9] Despite knowing that HSN and Interactive could not acquire such an interest,[10] Paxson, for business reasons, did not want language placed in the option that allowed for less than forty-five percent equity interest in Jovon.[11] During his deposition, Paxson stated:

> Q. Now on the second page of this document [the July 6, 1990 letter from

---

7. There was also a put-call agreement that allowed HSN to receive up to forty-nine percent of the proceeds of any sale of the station within five years.

8. The initial term of the affiliation agreement lasted seven years from the date the station began transmitting HSN programming. Jovon began transmitting HSN programming on or about March 1, 1991. Accordingly, the option would terminate on the later of March 1, 1998, or the date the loan was repaid.

9. On July 6, 1990, Feore wrote Paxson and informed him that HSN could not "have an ownership interest (not even nonvoting stock) in Jovon, because of its ownership of the Aurora, Illinois station." It is undisputed that the policy referred to in this letter was what was known as the FCC's cross-interest policy.

10. Paxson had for years been involved in the radio and television industry and was knowledgeable on the FCC ownership rules including the cross-interest policy.

11. Forty-five percent interests were what HSN routinely received from other minority

owned television stations when HSN financed the construction of those stations. Those stations were not constructed in markets where cross-interest policy concerns existed for HSN. Paxson stated in his deposition that the option had to be for forty-five percent:

> Q. . . . how did 45 become the standard?
> A. Negotiation with the very first transaction, and then it had to remain that, otherwise you couldn't have one guy at 20 and one guy at 30 because they all knew each other, all the affiliates knew each other, and it would have been unfair and they would have all been complaining. So they all had to have the same 45 but the 45 came out of the first negotiation.

Dep. Paxson at 101.

Stroud's testimony reaffirms Paxson's belief that giving any affiliate a different equity percentage would become known to other affiliates. He testified that he already knew that he was going to have to give HSN a forty-five percent equity interest in his station, because he had been told that by one of the other minority owners to which HSN had provided financing.

Feore] Mr. Feore wrote: At this time HSN cannot have an ownership interest, not even nonvoting stock in Jovon, because of its ownership of the Aurora, Illinois station. Therefore we have provided for an option agreement to acquire 45 percent interest in Jovon. Do you see that?

A. Yes.

. . . . .

Q. . . . .when he said here that HSN cannot have an ownership interest because of its ownership in the Illinois station, was that your understanding at the time?

A. Yes.

. . . . .

Q. Did he [Stroud] have flexibility as to the 45 percent?

A. No.

Q. Why not less than 45 percent?

A. Because that's what I negotiated. I wanted the maximum amount of equity that I could possibly get.

Q. Why don't you have a document that, an option agreement that said up to 45 percent as opposed to 45 percent?

A. Well, I might not get forty-five.

Q. So you didn't want that?

A. No, I wanted 45 percent. That's what I negotiated.

. . . . .

Q. Was it your decision to require 45 percent exclusive option, was that your decision?

A. Yeah.

Q. And did Mr. Feore follow your instruction?

A. To this day.

. . . . .

Q. Now did you understand in 1990 that HSN might not ever be able to own outright the shares of Jovon?

. . . . .

A. Yes.

Q. And that was based on what?

A. The current rules at the FCC and not knowing when they might or might not change.

Dep. Paxson at 39–41; *also id.* at 54–56; *id.* at 101–103.

In 1990, HSN and Interactive believed that either the FCC cross-interest policy would change and allow for an HSN affiliate to own the interest or HSN could sell the interest.[12] At that time, HSN had filed comments in a FCC rulemaking proceeding, seeking the FCC to relax ownership rules including the cross-interest policy.

Even if HSN was unable to exercise the option, Paxson stated that the option was not valueless to HSN at that time. He testified:

Q. . . . . Did you have a strategy back in 1990 as to what you could do, that is, HSN could do to insure that it would get value when the time came?

A. Yes.

Q. And can you explain for the record what that strategy was?

---

**12.** On November 21, 1990, Feore wrote a lawyer in HSN's general counsel's office, reconfirming that in order for HSN to be able to exercise the option the FCC would have to relax the cross-interest policy.

A. Well, we could sell the option to somebody else. Or in other cases that I had at that time, I would use what, I guess, I don't know of a better phraseology for it, but we would use a beard. In other words we would pay somebody to be the option holder. And when the equity was liquidated in whatever time frame it could be liquidated, they would receive a nominal sum for stepping in to the position of holding it and we would receive the bulk of the proceeds.

Q. ....do you believe that the option as drafted allowed HSN to get value for the option?

A. Yes.

Dep. Paxson at 42–43.

Finally, Paxson stated that he would have had no interest in having the option in whole or part exercisable through a voting trust. He stated:

Q. Is there anything about the option that does not allow HSN to use a voting trust? As far as you know?

A. I don't believe in them so it was never proposed at the time because I don't care for them. And I've had experience with them and I wouldn't ever do them. So it was never a possibility.

Q. As far as you were concerned?

A. That's correct.

Q. You didn't want that for HSN?

A. No.

Dep. Paxson at 56.

In addition to the option agreement, this action also implicates the shareholder agreement that the Strouds and Interactive (or its assignee) had to execute by the terms of the option upon closing. A copy of the shareholder agreement was attached to the option as Exhibit 1. Under the relevant terms of the shareholder agreement,[13] Class B shareholders (the class of shares that Interactive would have received from exercising the option) were free to transfer [14] any or all of their shares at anytime with limited restrictions.[15] However, if a Class B shareholder wished to *sell* all or part of his interest to a party who was not affiliated with the shareholder, then the shareholder agreement provided that the Class A shareholders (the Strouds) had a right of first refusal to buy the shares on the same material terms and conditions.

## D. THE CROSS–INTEREST POLICY

The FCC's cross-interest policy was [16] a policy designed to protect the "potential adverse effects on competition and diversity" in the mass media industry. *In re Roy M. Speer*, FCC 96–528, at 50 (June 14, 1996). The cross-interest policy applied to situations "where a party owns an attributable interest in one media outlet and en-

---

13. *See* Dep. Ex. 4.

14. Transfer was a defined term in the shareholder agreement. It was broadly defined to include any "sale, exchange, assignment, disposition, bequest, gift, pledge, mortgage, hypothecation, or otherwise, whether voluntary, involuntary or by operation of law, whether resulting from death, bankruptcy, insolvency, or otherwise ...." *See* Dep. Ex. 4, Tab 9, Ex. 1 at § 1.2.

15. The restrictions included the transferee agreeing to be bound by the shareholder agreement, the transfer being recorded in Jovon's stock transfer book, and that the shares must contain a legend that the shares were not registered and were restricted from resale. *See* Dep. Ex. 4, Tab 9, Ex. 1 at §§ 1.4, 1.5, 1.6.

16. The cross-interest policy no longer exists.

joys a 'meaningful relationship' with another media outlet serving 'substantially the same area.' " [17] *Id.* The FCC applied the cross-interest policy on a case-by-case basis. *See Attribution of Ownership Interests,* 97 F.C.C.2d 997, 1984 WL 251252 (1984); *Reexamination of the Commission's Cross–Interest Policy,* 2 FCC Red 3699 (1987).

In addition to the cross-interest policy, the FCC promulgated what were known as the attribution rules. Under the attribution rules, certain interests were not considered attributable by the FCC, like options, trusts, and non-voting stock. By complying with the attribution rules, a party involved in a communications transaction could have avoided many of the FCC's multiple ownership rules.

However, the attribution rules and the cross-interest policy were not completely coextensive. A party could violate the cross-interest policy while not violating the attribution rules. For example, the FCC determined that having a non-voting equity interest of fifty percent violated the cross-interest policy, but did not violate the attribution rules. *See In re News Int'l, PLC,* 97 F.C.C.2d 349 (1984). Plaintiffs, through an affidavit of a communications lawyer, took the position in the HSN*Jovon state court litigation that "it was reasonable for a person to conclude [in 1990] that a non-attributable equity interest of less than 50 percent would be found by the Commission [the FCC] not to violate the cross-interest policy." [18] Dep. Ex. 139; *also* Dep. Ex. 534 (containing a memorandum from Plaintiffs' counsel regarding the reasonableness of a forty-five percent non-voting equity interest under existing FCC precedent in 1990).[19]

At the time that the option was executed, the FCC had been reviewing the cross-interest policy for almost a year and it was uncertain whether the FCC would strengthen, relax, or keep the policy the same after that review. Finally in 1999, the FCC administrative proceeding concerning the cross-interest policy, which had been ongoing since 1989, concluded and the policy was eliminated.

## E. INITIAL ATTEMPTS TO EXERCISE THE OPTION

In the years after the transaction closed, the option and other agreements were assigned several times and a corporate restructuring, spin-off, and several name

---

**17.** When the option was closed, HSN had an attributable interest in another television station in the Chicago area.

**18.** Plaintiffs' communications expert in this case disagrees that the opinion expressed in the above quoted sentence was his sense of the law in 1990.

**19.** In 1990, there were principally two cases on non-voting equity interests and the cross-interest policy: (1) the *News Int'l* case cited above where 50% non-voting interest violated the cross-interest policy; and (2) the *Cleveland Television Corp. v. FCC* case where the

FCC concluded that a 33.33% interest did not violate the cross-interest policy. 732 F.2d 962, 968–70 (D.C.Cir.1984). The D.C. Circuit opinion in *Cleveland Television* could have been seen as approving up to a 44% with other entanglements as not violating the cross-interest policy. 732 F.2d at 968.

According to that affidavit in 1994, the FCC reinvigorated the cross-interest policy and non-attributable equity interests in a series of cases, holding that interests greater than 33.33% presumptively violated the cross-interest policy. *See* Dep. Ex. 139.

changes occurred. First in 1992, HSN and Interactive separated and no longer had a parent-subsidiary relationship.[20] After the separation, Interactive assigned the option purportedly for consideration to one of its affiliates, Silver King Broadcasting of Illinois, Inc. ("Broadcasting"). Then, also in 1992, Broadcasting assigned the option again allegedly for consideration to Silver King Capital Corporation, Inc. ("Capital").[21]

In 1994, HSN began having difficulties with Jovon preempting HSN programming. On or about August 18, 1994, HSN notified Jovon that it was terminating the affiliation agreement effective November 1994. Interactive (then known as Silver King) learned of the termination. Interactive became concerned about the uncertainty of the option's duration because, in Interactive's opinion, the option was not clear on what happened if HSN terminated the affiliation agreement. Interactive believed that Jovon perhaps could terminate the option if Jovon pre-paid the loan.[22] In addition, the option became more important to Interactive because Interactive's corporate separation from HSN and/or HSN's termination of the affiliation agreement meant that it possibly could hold an equity interest in Jovon.

Therefore, Interactive had Defendants approach the FCC about the exercise of the option (without disclosing Interactive's identity) under the cross-interest policy. When Defendants approached the FCC, the FCC indicated that it was concerned about cross-interest policy issues because of the size of the equity interest (forty-five percent) and suggested that Defendants' client (Interactive) utilize an insulated trust to avoid those issues. After the meeting, Defendants researched the use of a trust. Defendants learned that under either Florida or Delaware law a trust likely would not be an "affiliate" and assigning the option to a trust might trigger Jovon's right of first refusal.[23]

Meanwhile, Interactive tried to clarify the terms of the option with Jovon. Initially, Jovon ignored Interactive's request. In October 1994, Capital, the affiliate of Interactive then holding the option, sent Jovon a formal notice that it wished to exercise the option and schedule a closing date. Soon thereafter, Jovon declined to close citing cross-interest policy concerns. The parties then continued negotiating the exercise of the option. At some point in that negotiation, Jovon offered to pay Interactive $500,000.00 over three years for the option. Interactive refused Jovon's offer and, rather than seek another buyer, rescheduled the closing. Jovon again refused to close because of cross-interest policy concerns.

By the end of 1994–beginning of 1995, Jovon's position was that it would not issue

**20.** At that time, Interactive was known as HSN Communications, Inc. As a result of its spin-off or separation from HSN, HSN Communications, Inc. changed its name to Silver King Communications, Inc. ("Silver King"). Silver King years later changed its name to Interactive.

**21.** Silver King, Broadcasting, or Capital also held the loan agreement and most of the other transaction documents after the separation of Interactive and HSN.

**22.** However, Interactive was also concerned about Jovon's ability to continue making payments under the loan agreement (which they also held) absent the payment stream under the affiliation agreement.

**23.** Defendants actually drafted a trust agreement for Interactive, but never provided Interactive with a copy.

stock to Capital or any affiliate of Interactive pursuant to the option unless Interactive sought and obtained a ruling from the FCC. However, it was clear to Feore that Jovon never wanted to see the option close because: (a) of the increase in value of the station; and (b) Jovon now believed that the HSN*Jovon transaction was "overbearing and entirely one sided" in favor of HSN and Interactive. At that time, Feore was of the opinion that FCC approval would need to be obtained for the exercise of the option and*or a state court action would need to be filed seeking specific performance of the option. Feore drafted a declaratory request to be filed with FCC for Interactive. The declaratory request, which was never filed, sought FCC approval for Interactive to exercise the option in full.

In early 1995, Interactive replaced Defendants with new counsel. In October 1995, Interactive, on behalf of Capital, again sought to exercise the option, offering this time to fully indemnify Jovon for any consequence that resulted from application of the cross-interest policy to Jovon. Again, Jovon refused to consummate the stock transfer.

## F. INITIAL FCC PROCEEDINGS

After Interactive demanded that Jovon comply with the option in October 1995, Jovon responded by filing a petition with the FCC to deny Interactive's application for change of control, seeking to block the transfer of ownership of Interactive and the stations that it owned. Jovon was one of two formerly affiliated HSN companies who objected to the transfer.[24] Jovon's petition was based on Interactive's alleged violation of the cross-interest policy and other FCC ownership rules.[25]

In November 1995, Jovon withdrew its petition and substituted a petition for declaratory ruling with the FCC. The petition for declaratory ruling requested that the FCC issue a declaratory judgment holding that the option violated the cross-interest policy and was void as against public policy. Interactive filed an opposition to the petition, arguing that exercise of the option complied with the cross-interest policy. Interactive agreed with Jovon that the matter was appropriate for resolution before the FCC.

On June 14, 1996, the FCC issued its memorandum opinion and order on the petition for declaratory relief (the "First FCC Order").[26] The First FCC Order appears to have been a mixed decision for Jovon and Interactive. In Jovon's favor, the FCC found that Interactive's "full exercise of the existing option to buy a 45-percent equity interest in Jovon would conflict with the Commission's cross-interest policy." *In re Roy M. Speer*, FCC 96-528, at 43 (June 14, 1996). Additionally, the FCC concluded that several provisions in the loan agreement and the option vio-

24. Both were minority owned stations for which HSN funded the construction. The other petition was filed by Urban Broadcasting Corporation. Interactive held a forty-five percent non-voting equity interest in Urban. The petition raised arguments that Interactive 'exercised "an impermissible degree of influence' " in Urban's station. *In re Roy M. Speer*, FCC 96-528, at 5 (June 14, 1996).

25. Jovon also alleged that Interactive violated the duopoly rule. The duopoly rule is another ownership rule that prohibits ownership, operation, and control of multiple television stations when the Grade B contour overlaps.

26. The First FCC order also disposed of several other matters including Urban's challenge to the transfer of ownership of Interactive.

lated FCC policy and deleted those provisions from the agreements. *See id.* at 49–50. In Interactive's favor, the FCC stated that Interactive "may not exercise its option in full at this time. It may, however, exercise the option so that it acquires no more than one-third of the equity of Jovon." *Id.* at 51.

Despite the First FCC Order being a mixed decision, Interactive decided not to appeal or seek reconsideration of the First FCC Order because of other FCC issues that were ongoing with the transfer of Interactive. Interactive's counsel believed that they could get the voting trust approach[27] approved separately by the FCC to exercise the option after the First FCC Order became final. On July 12, 1996, before the period to appeal the First FCC Order expired, Jovon terminated the option, citing to the termination clause and the favorable language in the First FCC Order. Jovon's letter terminating the option did not change Interactive's decision on taking an appeal or moving for reconsideration.

On the last day to seek reconsideration or appeal, Jovon petitioned for clarification of the First FCC Order. The petition sought reconsideration of those portions of the First FCC Order that reformed or rewrote the option to allow for the exercise of less than forty-five percent. Jovon also sought reconsideration of those portions of the First FCC Order that allowed the option, or a portion of the option, to spring back to life, arguing that the option was illegal when it was created and could not be revived. Initially, Interactive's lawyers proposed to argue that the option allowed for use of a trust to exercise the full forty-five percent. Instead, Interactive argued that the FCC did not rewrite the option and the FCC had the power to reform contracts. In a footnote, Interactive raised, for the first time, the trust argument to the FCC, stating that:

> Even if a court were disinclined to apportion the performance of the Option Agreement, there is no need for the Commission to invalidate the option as Jovon requests. In lieu of apportioned performance, Silver King [now Interactive] would be amenable to placing the Jovon stock in trust concurrently upon exercise of the option in full. While the trust would be affiliated with Silver King in the sense that Silver King would be the sole beneficiary of the trust, the trust would provide for a totally independent trustee and otherwise be consistent with Note 2(e) to Section 73.3555 of the Rules and be in a form acceptable to the FCC.

No trust documents were attached for FCC approval. The decision to relegate the trust approach to a footnote was a strategic decision by counsel to not undermine Interactive's ability to obtain directly the full forty-five percent interest.[28]

In May 1997, while the petition for clarification was pending, Capital sent another letter to Jovon requesting to exercise the option and proposing 33.33% of the total issued and outstanding shares of Jovon be issued to Capital and 11.67% to SK Hold-

---

**27.** This approach was similar to the approach mentioned by the FCC to Defendants and Plaintiffs in 1994. Under this approach, all or part of Plaintiffs' equity interest in Jovon would be assigned to an insulated trust after the option was exercised by Capital.

**28.** Interactive's counsel was concerned that the trust approach would trigger Jovon's right of refusal under either the option or shareholder agreement and Interactive would lose the eleven and two-thirds percent interest in Jovon.

ings, Inc. ("Holdings").[29] The letter indicated that the shares issued to Holdings would be immediately transferred to a trust in accordance with FCC policy. The letter also indicated that after the transaction was completed HSN would seek approval of the FCC. As was probably expected, Jovon refused to close the option, citing the First FCC Order and their letter which terminated the option. In July 1997, Interactive submitted a copy of the trust proposal by a letter to the FCC. The letter did not request FCC approval of the trust proposal and again did not contain a copy of proposed trust documents.

## G. THE STATE COURT PROCEEDINGS AND SUBSEQUENT FCC PROCEEDINGS

In response to another refusal to close, on May 30, 1997, Interactive, HSN, Capital, and Holdings filed suit against Jovon in a Florida state court. The Florida state court stayed the case at Jovon's request while the FCC considered Jovon's petition for clarification. On September 11, 1998, the FCC issued its Memorandum Opinion and Order on Jovon's petition for clarification. *In re Roy M. Speer*, FCC 98–200 (Sept. 11, 1998) (the "Second FCC Order"). The Second FCC Order, like the First FCC Order, was a mixed decision for Jovon and Interactive. The FCC concluded that in the First FCC Order it had not indicated that the unexercised option violated the cross-interest policy. In other words, the option as drafted was legal. However, the FCC continued that it also had not reformed the option to allow Interactive to exercise the option and acquire a 33.33% non-voting stock interest. The FCC stated that:

> [i]n reaching our decision [the First FCC Order], we [the FCC] assumed the validity of the Option Agreement, and ruled only on whether it comported with our regulations and policies. It is for another forum, such as the courts, to determine the effect, if any, of our decision on the validity of the Option Agreement given the various provisions contained therein.

The Second FCC Order made no mention of Interactive's proposed use of a trust.

On October 13, 1998, Interactive filed a request for clarification with the FCC. The request for clarification sought primarily approval of a trust to allow for the exercise of the option with 33.33% of the total issued and outstanding shares of Jovon being issued to Capital and 11.67% to Holdings. Plaintiffs then proposed to immediately assign Holdings interest to a properly insulated trust. Soon thereafter, the state court lifted the stay on the state court litigation. Additionally, Jovon sent a second termination letter and moved for summary judgment. Interactive, HSN, Capital, and Holdings opposed Jovon's motion for summary judgment.

On June 1, 1999, the state court granted summary judgment to Jovon. The state court order granting summary judgment stated in relevant part:

> The FCC previously ruled that the giving of a 45% interest in Jovon to Plaintiffs does not comply with FCC standards and cannot be enforced. Therefore, according to the FCC, the

---

**29.** At some point in time in 1995 or 1996, Interactive acquired HSN and in a corporate restructuring Capital became a direct subsidiary of HSN with Interactive becoming the ultimate parent company. In effect, Interactive and HSN flip-flopped the parent and subsidiary relationship that existed in 1990.

Option Agreement is not legal. Jovon has legally terminated the Option Agreement. At the time Jovon terminated the Option Agreement in October of 1998, it was not in default or any way in a position where its termination was not legal.

The state court's summary judgment order does not address the trust approach advocated by Interactive, HSN, Capital, and Holdings. Interactive, HSN, Capital, and Holdings appealed that ruling to the Second District Court of Appeal.

On November 8, 1999, the FCC dismissed as moot Interactive's petition for clarification. *See In re Roy M. Speer,* FCC 99–328 (Nov. 8, 1999) (the "Third FCC Order"). In the Third FCC Order, the FCC stated that:

> [i]n view of the fact that the Option Agreement has been terminated and no longer exists, we need not reach the question of whether Silver King's [now known as Interactive] proposed use of a trust mechanism in this case complies with the Commission's policies and precedent.

*Id.* at 11.

Interactive petitioned for reconsideration of the Third FCC Order, arguing principally that the petition for clarification was not moot because Plaintiffs appealed the state court ruling. On October 6, 2000, the FCC granted Interactive's petition for reconsideration. *See In re Roy M. Speer,* FCC 00–357 (Oct. 6, 2000) (the "Fourth FCC Order"). The Fourth FCC Order was not, however, a complete victory for Interactive. The FCC concluded that it "believe[d] that Silver King's [now Interac-

tive's] proposed use of a trust mechanism to exercise its option comported with the Commission's former cross-interest policy and precedent." [30] *Id.* at 8. The FCC continued that it was "[a]ssuming that the trust met our insulation standards ...." *Id.* at 9. However, the FCC noted that "... Silver King never submitted the proposed trust instrument for our [the FCC's] review and approval." *Id.* Before Interactive could use the proposed trust mechanism, the FCC required that it submit the trust documents. *See id.* Finally, the FCC stated that it was not deciding whether Interactive could have utilized the proposed trust approach under the option, which the FCC concluded was a matter for the state court. *See id.*

Interactive, HSN, Capital, and Holdings and Jovon submitted supplemental briefs to the Second District Court of Appeal and also submitted the Fourth FCC Order. On November 15, 2000, the Second District Court of Appeal per curiam affirmed the state court's summary judgment without any opinion. Interactive, HSN, Capital, and Holdings moved for rehearing en banc and for certification. On February 5, 2001, the Second District Court of Appeal denied Interactive's, HSN's, Capital's, and Holdings's motions.

After the Second District Court of Appeal's decision was final on June 12, 2001, Capital assigned to USA Broadcasting, Inc. ("USAB") all Capital's rights and causes of action arising out of the option. USAB was the parent company of Capital. Soon thereafter, Capital was sold as part of a transaction with Univision Communications, Inc. ("Univision").[31]

## H. THE MALPRACTICE ACTION

On July 15, 2002, Interactive, HSN, Holdings, and USAB sued Defendants, al-

---

**30.** By this time, the cross-interest policy had been eliminated by the FCC.

**31.** Subsequently in 2003, USAB assigned whatever option rights it possessed to Interactive.

leging counts for legal malpractice and breach of fiduciary duty. Capital was not a party to Plaintiffs' complaint. On March 2, 2004, the parties filed cross motions for summary judgment, raising a host of issues. On April 15, 2004, this Court held oral argument on the motions.

### III. SUMMARY JUDGMENT STANDARD

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *See id.* Throughout this analysis, the district court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *See id.* at 255, 106 S.Ct. 2505.

### IV. DISCUSSION

Under Florida law,[32] a plaintiff bringing a legal malpractice claim must demonstrate: (1) the attorney's employment; (2) the attorney's neglect of a reasonable duty; and (3) the attorney's negligence resulted in and was the proximate cause of a loss suffered by the plaintiff. *See Kates v. Robinson,* 786 So.2d 61, 64 (Fla. 4th DCA 2001); *Olmstead v. Emmanuel,* 783 So.2d 1122, 1125 (Fla.App. 1st DCA 2001); *Hold v. Manzini,* 736 So.2d 138, 142 (Fla. 3d DCA 1999); *Tarleton v. Arnstein & Lehr,* 719 So.2d 325, 328 (Fla. 4th DCA 1998) (per curiam). Similarly, a plaintiff bringing a fiduciary duty cause of action must prove: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) that the breach of the fiduciary duty resulted in and was the proximate cause of a loss suffered by the plaintiff. *See Gracey v. Eaker,* 837 So.2d 348, 353 (Fla.2002). Defendants' motions for summary judgment attack each and every element of Plaintiffs' legal malpractice and breach of fiduciary claims. After close consideration, this Court concludes that summary judgment in Defendants' favor is appropriate.[33]

### A. MOTION FOR SUMMARY JUDGMENT ON STANDING

Before reaching the merits of this dispute, this Court must determine whether

---

**32.** In this case, this Court's jurisdiction is based upon its diversity jurisdiction, 28 U.S.C. § 1332, and this case arises under Florida law. In diversity cases arising under Florida law, a federal court is bound by the law articulated by the Florida Supreme Court. *See Shapiro v. Associated Int'l Ins. Co.,* 899 F.2d 1116, 1118 (11th Cir.1990). If the Florida Supreme Court has not spoken on an issue, Florida District Court of Appeals decisions control absent persuasive indication that the Florida Supreme Court would rule otherwise. *See Blanchard v. State Farm Mut.*

*Auto. Ins. Co.,* 903 F.2d 1398, 1399 (11th Cir.1990). If there is no authority, this Court is to make an "educated guess" as to how a Florida court would rule. *See Shapiro,* 899 F.2d at 1118–19.

**33.** Because of this Court's decision on the motion for summary judgment on standing and causation, this Court does not reach Plaintiffs' motion for summary judgment or Defendants' motion *in limine.*

Plaintiffs have standing to bring this action. To the extent that a standing problem exists in this case, the problem is caused by Capital not being a party. Capital was the entity that held and attempted to exercise the option from 1992–2001. Capital is no longer related to either Interactive · or HSN because Interactive sold Capital to Univision.

■ Standing has two components: (a) the constitutional requirements of Article III; and (b) prudential considerations. *See Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Franchise Tax Bd. of Calif. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 335, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990). The Article III requirements of standing require a plaintiff to demonstrate: (1) an injury in fact that is " 'concrete and particularized, and actual or imminent, not conjectural or hypothetical;' " (2) a causal connection that is "fairly traceable" between the injury and the misconduct; and (3) redressability of the harm by a favorable order of a court. *See, e.g., Bennett*, 520 U.S. at 162, 117 S.Ct. 1154; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ In addition, the federal judiciary has imposed on itself certain prudential principles that, like the Article III requirements, limit this Court's jurisdiction. *See Alcan Aluminium*, 493 U.S. at 336, 110 S.Ct. 661. One of those prudential principles is that parties must generally assert their own legal rights and interests and not rely on the rights and interests of third parties in creating standing to bring an action. *See id.* As a corollary to the proceeding prudential principle, courts have created what is known as the shareholder rule. *See id.* Under the shareholder rule, a shareholder does not have standing to enforce the rights of a corporation, except when the shareholder also has a direct, personal interest in the cause of action. *See id.*

The Eleventh Circuit and the former Fifth Circuit have applied this prudential principle and corollary to hold that a shareholder does not have standing to assert a claim of a corporation, unless the shareholder shows that a duty was owed directly and independently to him. ˙ *See KMS Restaurant Corp. v. Wendy's International, Inc.*, 361 F.3d 1321, 1324 (11th Cir.2004); *Citibank, N.A. v. Data Lease Financial Corp.*, 828 F.2d 686, 694 n. 11 (11th Cir.1987); *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. July 6, 1981) (per curiam).[34] For example in *Data Lease*, the Eleventh Circuit concluded that a shareholder could sue directors installed by a pledgee,[35] because those directors owed a separate duty to the shareholder independent of the pledge agreement. 828 F.2d at 694. Similarly in *Stevens*, the former Fifth Circuit concluded that a shareholder did not have standing to sue a third party for the diminution in value of his stock in a corporation caused by the third parties' conduct to that corporation. 643 F.2d at 1080.

#### 1. Interactive

■ Interactive argued, though it is not

---

**34.** In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to September 30, 1981. 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**35.** The corporation in which the shareholder · held a majority of shares was the pledgor.

one of its principal arguments,[36] that it has standing in this case because it was the original party to the option. This Court agrees. First, it is undisputed that Interactive was a client of Defendants when Defendants drafted the option. Therefore, Defendants owed a separate duty to Interactive. Second, Defendants concede that under Florida law the appropriate measure of damages for the destruction of the option is the option's value on the date when defendant's (alleged) tortious conduct destroyed the option. *See, e.g., Burtless v. Pallero,* 570 So.2d 1140, 1140 (Fla. 4th DCA 1990); *Polyglycoat Corp. v. Hirsch Distributors, Inc.,* 442 So.2d 958, 960 (Fla. 4th DCA 1983). If that is true, then as of August 7, 1990, Interactive suffered an injury.[37] Interactive's subsequent assignment of the option to Broadcast, and Broadcast's assignment of the option to Capital in these circumstances would not seemingly alter this conclusion (at least as far as standing is concerned).[38] At the time the option was drafted, assigning the option from Interactive to an affiliated entity was contemplated by both Interactive and Defendants. Indeed, the option expressly allowed for the assignment to an affiliated entity without triggering Jovon's right of refusal. Therefore, this Court concludes that Interactive has standing to bring this action.

■ While this Court concludes that Interactive has standing to bring this action, this Court disposes of several of Interactive's alternative arguments on standing. Interactive also argued that Capital was a "mere instrumentality" of Interactive and that relationship allows Interactive to bring suit on Capital's behalf. Interactive has not cited to a Supreme Court, Eleventh Circuit, or any Florida case, creating such an exception to the prudential limitations on standing. Instead, Interactive relies primarily on a New York appellate court decision that denied standing to a parent corporation because the subsidiary was not a mere instrumentality of that parent. *See Alexander & Alexander of New York, Inc. v. Fritzen,* 114 A.D.2d 814, 495 N.Y.S.2d 386, 388–89 (N.Y.App.Div. 1985). The New York appellate court, however, did not indicate what a parent corporation must show to demonstrate that a subsidiary is a mere instrumentality of a parent.

This Court rejects Plaintiffs' argument. First, such an exception is contrary to binding authority in the Eleventh Circuit. *See, e.g., Stevens,* 643 F.2d at 1080. Second, it seems inequitable to allow Interactive to consciously cloak itself in the corporate veil as a shield to the liabilities of its subsidiaries only to allow it to voluntarily disregard that separateness when it serves

---

36. It is not one of their principal arguments because it seemingly would undermine Plaintiffs' theory of the measure of damages in this case.

37. This Court would note that under Florida law damages for legal malpractice "must be ... within the contemplation of the parties." *Chadwick v. Corbin,* 476 So.2d 1366, 1368 (Fla. 1st DCA 1985). This Court seriously doubts that it was within the contemplation of the parties in August 1990 that Interactive would sell its interest in Jovon (acquired through the option) in 2002. A more likely scenario is that the parties in August 1990

contemplated that by March 1, 1998, (the end of the initial term of the option) the option would be exercisable or could be sold. This Court declines to reach the issue of whether Plaintiffs' expert report and damages theory is speculative because of this Court's conclusion on causation.

38. Those assignments might effect the measure of damages available to Interactive. This Court also declines to reach this issue because of its conclusion on causation.

its interest. The same showing should be required to disregard the separateness of corporate entities as is required of a creditor attempting to pierce the corporate veil. Under Florida law, more than a high degree of control by a parent corporation is required before a subsidiary is deemed to be a mere instrumentality of a parent. *See American Int'l Group, Inc. v. Cornerstone Businesses, Inc.*, 872 So.2d 333, 336–337 (Fla. 2d DCA 2004).[39] Under *Cornerstone*, the parent must also have committed a fraud or some wrongdoing through its subsidiary before the corporate veil will be pierced. *See id.* at 337 (quoting *Federated Title Ins., Inc. v. Ward*, 538 So.2d 890, 891 (Fla. 4th DCA 1989)). Interactive has not alleged and there is no evidence in the record that it committed fraud or wrongdoing through Capital that would justify disregarding Capital's separate corporate identity.

■ Next, Interactive alternatively argued that it had standing because Capital assigned its rights in the option to USAB and USAB (after this case began) assigned its rights to Interactive. Defendant is correct that Florida law normally does not allow a party to assign a legal malpractice claim. *See Forgione v. Dennis Pirtle Agency, Inc.*, 701 So.2d 557, 559 (Fla.1997); *Weiss v. Leatherberry*, 863 So.2d 368, 371 (Fla. 1st DCA 2003); *National Union Fire Ins. Co. v. Salter*, 717 So.2d 141, 142–43 (Fla. 5th DCA 1998). However, some courts from other jurisdictions allow assignment of claims in similar commercial transactions. Additionally, Interactive also cites to several cases involving Florida legal malpractice claims where courts ap-

parently allowed assignments of those claims. *See, e.g., Kaplan v. Cowan Liebowitz & Latman, P.C.*, 832 So.2d 138, 139–40 (Fla. 3rd DCA 2002) (involving an assignment of legal malpractice claim under Florida's assignment for the benefit of the creditors statute); *FDIC v. Martin*, 770 F.Supp. 623, 626–27 (M.D.Fla.1991) (involving federal statute which allowed assignment of any asset).

In *Salter*, the Fifth District Court of Appeal held that an insured could not assign a legal malpractice action to an insurer and the insurer was not subrogated to the insured's claim against his attorneys for malpractice. 717 So.2d at 142–43. *Salter* involved a legal malpractice claim that arose out of a commercial real estate transaction. *See id.* The Fifth District Court of Appeal made no distinction in Florida's anti-assignment rule even though a commercial transaction was involved.

In *Kaplan*, the Third District Court of Appeal held, however, that an assignee in an assignment for the benefit of the creditors action had standing to bring the legal malpractice claim. 832 So.2d at 140. *Kaplan* involved a defunct corporation that assigned by operation of a Florida statute its legal malpractice claim against the lawyers who prepared a private placement memoranda. *See id.* The court distinguished the general Florida rule against assignment by arguing that the assignment was by operation of law and that the malpractice claim involved the drafting of a document that by its nature would be relied on third parties other than the client. *See id.*

---

**39.** In that case, a parent corporation appealed the denial of a motion to compel arbitration. The trial court determined that the parent corporation waived the arbitration provision in a contract between the subsidiary corporation and the plaintiff. The Second District Court of Appeal reversed, concluding that the Plaintiff had not shown that the subsidiary corporation was a mere instrumentality of the parent. *See id.* at 336–37.

This Court concludes that *Kaplan* is distinguishable from this case and does not signal a drastic change in Florida legal malpractice law, but is confined to the factual situation in that case. In this case, no Florida statute compelled the assignment from Capital of its legal malpractice claim. Similarly, this case does not involve a document, like the private placement memorandum in *Kaplan*, that is expected to be relied on by third parties. Therefore, this Court concludes that Capital or USAB could not validly assign a malpractice claim to Interactive.

### 2. HSN

 This Court's conclusions with respect to Interactive compels a similar conclusion with respect to HSN. In the HSN*Jovon transaction, HSN was a client of Defendants. HSN was the HSN entity named in both the loan agreement and the affiliation agreement. HSN's president and officers, and not Interactive's president, negotiated the transaction and interacted with Defendants. Additionally, HSN, and not Interactive, paid the consideration for which Jovon granted the option to Interactive. Defendants owed HSN a duty independent of that owed to Interactive. Even if HSN was not Defendants' client with respect to the option, this Court would conclude based on the option itself that it was an intended beneficiary of the option based on the preamble of the option. More troublesome to this Court is HSN's assignment of the loan agreement and its spin-off of Interactive. It is undisputed that both transactions occurred for value. When Interactive acquired HSN, HSN's damages for any malpractice in the HSN*Jovon transaction would not revive. This Court concludes that HSN has standing to bring this action, but a more difficult

question exists on what damages it could seek in any action.[40]

### 3. USAB and Holdings

 This Court concludes that USAB and Holdings lack standing to bring a malpractice claim because Defendants did not owe an independent duty to either USAB or Holdings. Under Florida law, a party is an intended beneficiary to a lawyer's services, if and only if the lawyer and the clients clearly express "an intent to primarily and directly benefit the third party or a class of person to which that party claims to belong." *Hunt Ridge at Tall Pines, Inc. v. Hall,* 766 So.2d 399, 400–01 (Fla. 2d DCA 2000). While this Court agrees with Plaintiffs that the relevant contract for determining whether a party is an intended beneficiary is the contract between the attorney and the client, Florida courts have routinely looked to the underlying transaction documents to determine the attorney's and client's intent when no written contract exists between the lawyer and the client. *See id.* at 400–01.

 Under the plain terms of the option, the only intended beneficiaries of the option were HSN and affiliates who were assigned the option. It is undisputed that neither USAB nor Holdings ever were assigned, held, or attempted to exercise the option. USAB and Holdings would not be within the class of persons who were intended beneficiaries. In analogous factual situations, Florida courts have concluded such parties to be incidental beneficiaries and not intended beneficiaries of a lawyer's services, and have denied those parties standing to bring a malpractice action. *See id.; Silver Dunes Condominium of*

---

**40.** Because of this Court's conclusion on cau- sation, this Court need not reach this issue.

*Destin, Inc. v. Beggs and Lane,* 763 So.2d 1274, 1276–77 (Fla. 1st DCA 2000) (per curiam); *Brennan v. Ruffner,* 640 So.2d 143, 146–47 (Fla. 4th DCA 1994). Because USAB and Holdings were neither clients of Defendants nor intended third-party beneficiaries of the option, Defendants owed them no duty and standing does not exist.

■ USAB argues alternatively that it has standing based on the diminution in value of its stock interest (as the sole shareholder) of Capital caused by Defendants alleged legal malpractice. USAB's diminution argument is identical to the argument made and rejected by the former Fifth Circuit in *Stevens.* 643 F.2d at 1080. Additionally, USAB asserts that it has standing based on the assignment by ., Capital of its legal malpractice claim to USAB. This Court has already concluded that under such circumstances a legal malpractice claim under Florida law is not assignable. Therefore, this Court concludes that USAB and Holdings lack standing to bring this action and dismisses them as parties to this action.

### B. MOTION FOR SUMMARY JUDGMENT ON CAUSATION

This Court concludes that summary judgment on the third element of Plaintiffs' claims, the causation element, is ap-

propriate. Plaintiffs are correct that normally in negligence cases "the determination of proximate cause is ordinarily a question that should be left for a jury." *Gulfstream Park Racing Assoc., Inc. v. Gold Spur Stable, Inc.,* 820 So.2d 957, 960 (Fla. 4th DCA 2002). In the rare case, however, where either the facts or the law favor resolution by summary judgment, summary judgment is appropriate.[41]

In *Proto v. Graham,* the Fifth District Court of Appeal summarized the proximate causation standard in a legal malpractice action[42] when it stated that a plaintiff:

must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. *A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.*

788 So.2d 393, 396 (Fla. 5th DCA 2001) (quoting *Gooding v. Univ. Hosp. Building, Inc.,* 445 So.2d 1015, 1018 (Fla.1984)) (emphasis in original).

### 1. Interactive and HSN failed to produce evidence of causation.

■ This Court concludes that summary judgment is appropriate because De-

---

**41.** *See, e.g., Gresham v. Strickland,* 784 So.2d 578, 581–82 (Fla. 4th DCA 2001) (concluding summary judgment was appropriate on causation); *Brennan v. Ruffner,* 640 So.2d 143, 147 (Fla. 4th DCA 1994) (affirming grant of summary judgment in breach of fiduciary case on lack of causation against lawyer based on undisputed facts); *Chipman v. Chonin,* 597 So.2d 363, 364 (Fla. 3d DCA 1992) (per curiam) (stating that "where reasonable minds cannot differ, proximate cause be-

comes a question of law."); *Chadwick v. Corbin,* 476 So.2d 1366, 1368–69 (Fla. 1st DCA 1985) (concluding that directed verdict was appropriate on malpractice claim based on Florida Statute and despite expert opinion to the contrary).

**42.** A similar standard would apply to a breach of fiduciary duty claim.

fendants advised HSN and Interactive that the option was likely not exercisable without a change in the cross-interest policy. In *Brennan v. Ruffner*, the Fourth District Court of Appeal affirmed the grant of summary judgment in favor of a defendant, in part, concluding that under the undisputed facts of that case proximate cause was lacking. 640 So.2d 143, 147 (Fla. 4th DCA 1994). The lawyer in that case drafted a shareholder agreement allegedly on behalf of a corporation and a minority shareholder. *See id.* at 145. The agreement contained a clause that allowed the majority shareholders to terminate the minority shareholder's interest in the corporation at any time. *See id.* The minority shareholder testified that he was made aware of the provision, but went ahead and signed the agreement after one of the majority shareholders promised him that he would never use the provision. *See id.*

The case before this Court is almost identical to *Brennan*.[43] In 1990, there was no structure for any HSN affiliated entity to own any outright interest in Jovon because of the cross-interest policy. However, an HSN affiliated entity, in this case Interactive, could hold an option to pur-chase a forty-five percent non-voting equity interest in Jovon without violating the cross-interest policy. At that time, Feore advised Paxson of the cross-interest policy concerns and that it was likely that no HSN affiliated entity would ever be able to exercise that option.[44] Despite this advice, Paxson, on behalf of HSN and Interactive, negotiated and consummated an option to purchase a forty-five percent non-voting equity interest in Jovon. Paxson was not interested in acquiring less than the forty-five percent interest for business reasons.[45] Paxson believed that either the cross-interest policy would change as a result of an ongoing FCC proceeding[46] (allowing a HSN*Interactive entity to exercise the option) or it could recoup some value out of the option either through a sale or friendly third party transaction.[47] Under those facts, this Court concludes that summary judgment is appropriate because HSN*Interactive knew (at the time the option was consummated) that they were likely not able to exercise the option and chose to proceed with the transaction.

### 2. The option was exercisable as drafted.

Even if summary judgment were inappropriate on the preceding ground, this

---

**43.** Plaintiffs argue that this Court should not grant summary judgment on causation in part because Paxson's testimony is not credible because of his friendship with Feore. However, after Defendants carry their burden of showing an absence of a genuine issue of material fact, Plaintiffs bear the burden of producing some evidence or pointing to some inference that defeats summary judgment. Plaintiffs have failed to meet this burden and merely questioning Paxson's credibility is insufficient as a matter of law.

**44.** He reconfirmed this advice in a memorandum to HSN's general counsel's office several months later.

**45.** Such an equity interest was what HSN required in several other minority deals and for business reasons Paxson did not want less than a forty-five percent interest.

**46.** Such a proceeding had been pending before the FCC for approximately a year in August 1990. Defendants filed comments on behalf of HSN in that proceeding arguing for the relaxation or repeal of the cross-interest policy.

**47.** Unfortunately for HSN*Interactive, the FCC cross-interest policy did not relax until after the option would have expired under its own terms. Neither HSN nor Interactive attempted to either sell the option or conduct a third party transaction.

Court would conclude that, as a matter of law, the option was exercisable as drafted and Defendant would be entitled to summary judgment anyway. Defendants argue that the option as drafted was exercisable through a transfer of an eleven and two-thirds percent interest to an insulated trust after the exercise of the option pursuant to the shareholder agreement. First, Interactive and HSN argue that Defendants are precluded by the prior state court judgment from litigating this issue. Second, Interactive and HSN argue that the option was not exercisable.

### a. Collateral estoppel does not attach to the state court judgment.

■ While it may lead to a harsh result, this Court concludes that Defendants are not precluded from arguing that the option was exercisable despite the state court judgment to the contrary. This Court is to give the same effect to that judgment as would courts in Florida. *See, e.g., Quinn v. Monroe County*, 330 F.3d 1320, 1328–29 (11th Cir.2003). Under Florida law, collateral estoppel applies if: (a) an identical issue is being litigated by the parties in the subsequent litigation; (b) the issue was previously fully litigated; (c) the issue was litigated by the same parties or their privies; and (d) a final decision was reached by a court of competent jurisdiction. *See id.* Florida courts, under the third element, require mutuality of the parties for collateral estoppel to apply. *See id.* at 1330; *also E.C. v. Katz*, 731 So.2d 1268, 1269–70 (Fla.1999) (reaffirming the mutuality requirement).

■ Defendants argue that they were not parties or Plaintiffs' privies in the un-

derlying litigation. It is undisputed that Defendants were not parties to the state court action. However, Plaintiffs argue that Defendants were in privity with Plaintiffs in that action despite the attorney-client relationship being severed almost three years before that action was brought. Under Florida law in order to be in privity, one must have been "virtually represented" by a party or have an interest in the prior litigation such that it will be bound by the final judgment as if it were a party. *See* 330 F.3d at 1330.

In *Zeidwig v. Ward* the Florida Supreme Court considered the application of collateral estoppel in a subsequent legal malpractice action between a criminal defendant and his former counsel. 548 So.2d 209 (Fla.1989). In that case, the former client had unsuccessfully brought a post conviction proceeding based on the ineffective assistance of counsel. *See id.* at 209. The former client then sued his former attorney for malpractice. *See id.* Instead of concluding the attorney and his former client were still in privity after the termination of the attorney-client relationship and then utilizing collateral estoppel, the Florida Supreme Court created a narrow exception to the mutuality requirement in criminal-civil legal malpractice cases.[48] *See id.* at 214–15. In reaching its conclusion, the Florida Supreme Court agreed with a Michigan appellate decision that held that an attorney is not a party or privy of a former client in a subsequent action because the attorney had not " 'acquired an interest through or under one of the parties, as by inheritance, succession, or purchase' " in the subsequent action. *See id.* at 214 (quoting *Knoblauch v. Ken-*

---

48. Recently, the Florida Supreme Court reaffirmed that the *Zeidwig* exception is a narrow exception to the mutuality requirement con-
fined to the facts of that case. *See Katz,* 731 So.2d at 1269–70.

*yon,* 163 Mich.App. 712, 415 N.W.2d 286, 290 (1987)).

A similar rationale, as approved by the Florida Supreme Court in *Zeidwig,* applies in this case. This Court concludes that Defendants are not collaterally estopped from arguing that the option was exercisable despite of the state court judgment to the contrary.

### b. The option was exercisable.

In analyzing whether the option was exercisable as drafted, there are two issues for this Court to resolve: (1) whether the option was exercisable in full under the cross-interest policy; and (2) whether the option as drafted allowed for that exercise. The first issue is easily disposed of because the Fourth FCC Order, of which the state court trial judge did not have the benefit before his decision, clearly indicates that the option was exercisable under the cross-interest policy. According to the Fourth FCC Order, Interactive (or one of its affiliates) could have exercised the option (in compliance with the cross-interest policy) for the full forty-five percent interest as long as that affiliate immediately thereafter assigned an eleven and two-thirds percent interest to a properly insulated trust. Therefore, the option was exercisable under the cross-interest policy.

But, the Fourth FCC Order did not resolve whether: (a) the option was exercisable contractually in that manner; and (b) any of Jovon's rights of first refusal would be triggered by a transfer to the proposed trust. Those questions are resolved by examining the language of the option and the shareholder agreement, which are the two contracts that could govern the exercise of the option and the transfer of shares from Interactive (or its assignee) to the proposed trust.

Under Florida law, contract construction is a matter of law. *See Dows v. Nike, Inc.,* 846 So.2d 595, 601 (Fla. 4th DCA 2003). Where a contract provision is unambiguous, this Court is to give effect to the plain meaning of that contract language. *See Leisure Resorts, Inc. v. City of West Palm Beach,* 864 So.2d 1163, 1166 (Fla. 4th DCA 2003); *Dows,* 846 So.2d at 601; *SPP Real Estate (Grand Bay), Inc. v. Joseph J. Portuondo, P.A.,* 756 So.2d 182, 183–84 (Fla. 3d DCA 2000).

First, this Court concludes that the unambiguous language of the option allowed for a single entity to exercise the option.[49] Section 2.1 of the option provides that "[t]he Company [Jovon] hereby grants the Purchaser [Interactive or its assignee] exclusive option ... to purchase all of the authorized shares of Class B Series 1 Stock ... subject to the terms and conditions set forth herein." Section 3.2 provides that "[o]n the Closing the Company shall issue to the Purchaser, and the Purchaser shall purchase from the Company, all the authorized shares ... for the Purchase Price [defined as $45,000]." The clear and unambiguous language of these provisions allows for a unitary exercise of the option.

Next, this Court concludes that after an exercise of the option, the shareholder agreement would control any subsequent transfer by Interactive (or its assignee). By the unequivocal terms of the option, the parties were required at the closing of the option to execute the shareholder

---

**49.** This is slightly different than the proposal made to the FCC, but would be allowable under the Fourth FCC Order as long as that entity transferred eleven and two thirds percent to a properly insulated trust on the closing day.

agreement attached to the option. *See*. Dep. Ex. 10, § 3.4. At that point, the shareholder agreement, and not the option, would govern any subsequent transfer of shares by Interactive or its assignee.[50]

The shareholder agreement unambiguously allows for Interactive (or its assignee) to assign less than its full interest in Jovon to a proposed trust.[51] Section 1.2(B) of the shareholder agreement provides that "[e]xcept as restricted by Sections 1.4, 1.5, 1.6, and 2.8 and Article V hereof, the Class B Shareholder [Interactive or its assignee] may freely Transfer of *any or all* of its shares of Class B Stock to another person or entity . . . ." Dep. Ex. 4, Tab 9, Ex. 1, § 1.2(B) (emphasis added). The use of "any or all" clearly allows for a transfer of less than the whole forty-five percent. Further, Section 1.2(B) allows for a transfer to "another person or enti-

ty," which is extremely broad language and would not exclude a transfer to a trust. Additionally, "Transfer" is a defined term in the shareholder agreement,[52] meaning almost any imaginable form of transfer including sales, gifts, and assignments.

However, Section 1.2(B) of the shareholder agreement does contain several limitations on Interactive's right to "Transfer." Several of the Sections clearly do not impose any limitations on Interactive's proposed transfer to the trust in this case. Specifically, Sections 1.4,[53] 1.5,[54] 1.6,[55] and Article V [56] in no way limit Interactive's proposed transfer to the trust.[57] The only section that could limit Interactive's (or its assignee's) right to transfer an eleven and two-thirds interest in Jovon is Section 2.8.

Section 2.8 contains the right of first refusal for the Strouds.[58] It is noticeably

---

**50.** Section 2.5 of the option reconfirms that the option's assignment and right of first refusal only applies to transactions to acquire Jovon stock under the option. Section 2.5 states in relevant part: "[i]f the Purchaser desires to assign or transfer its rights to acquire stock of the Company granted it by this Agreement [the option] . . . ."

**51.** This Court's conclusion that the option does not apply after its exercise and Section 1.2(B)'s clear and explicit approval of a transfer of less than the whole forty-five. percent interest has the effect of limiting HSN and Interactive's damages, at best, to the value of eleven and two-thirds percent interest in Jovon. However, if Interactive or its assignee could have transferred that interest to the proposed trust without triggering the right of first refusal under the shareholder agreement, as this Court concludes, then summary judgment is appropriate.

**52.** Section 1.1 defines "Transfer" as the "sale, exchange, assignment, disposition, bequest, gift, pledge, mortgage, hypothecation or otherwise, whether voluntary, involuntary or by operation of law, whether resulting from death, bankruptcy, insolvency or otherwise . . . ."

**53.** Section 1.4 requires any transferee to agree to be bound by the shareholder agreement.

**54.** Section 1.5 requires that any transfer be recorded in Jovon's stock transfer record before any transfer is valid and effective.

**55.** Section 1.6 requires that legends be placed on the stock certificates regarding the transferability of the shares.

**56.** Article V is the termination provision that terminates the shareholder agreement if an absolute majority (50% of both classes of stock) agree in writing to terminate it or the corporation is dissolved.

**57.** The defined term Transfer appears throughout Article I and not just in Section 1.2. For example, it appears in Section 1.4, 1.5, and 1.6.

**58.** It is similarly worded to the right of first of refusal possessed by Interactive or its assignee if the Stroud's decided to sell their interests. Section 2.8 reads in relevant part: "[i]f the Class B Shareholder [Interactive or its assignee] desires to accept an *offer to sell* any

more narrow than the right of first refusal contained in the option, because the right of first refusal in the shareholder agreement applies only to offers to *sell* shares to entities that are not affiliates of Interactive (or its assignee) while the right in the option applied to all assignments or transfers to non-affiliates.[59] Further, Section 2.8 does not use the broad defined term "Transfer." This failure to use a defined term in Section 2.8 reinforces that only sales of shares fall within the scope of the right of first refusal contained in the shareholder agreement. If this Court construed "sale" any more broadly, such an interpretation would directly conflict with Section 1.2 of the shareholder agreement.[60] *See Publix Super Markets, Inc. v. Wilder Corp. of Delaware*, 876 So.2d 652, 654 (Fla. 2d DCA 2004) (holding that a contract should be read to give reasonable meaning to all provisions of that contract); *Kipp v. Kipp*, 844 So.2d 691, 693 n. 2 (Fla. 4th DCA 2003) (holding similarly).

But, this Court need not rely alone on giving effect to all the terms of the agreement because use of the word "sale" is unambiguous. "Sale" is normally understood as the "exchange of goods or services for an amount of money or its equivalent." Websters II: New College Dictionary 975 (Houghton Mifflin Co.1999). Using this definition, this Court concludes that the right of first refusal would not be triggered by a transfer to a trust as long as the trust did not pay value for that transfer. Because under the plain and unambiguous terms of the shareholder agreement it was possible for Interactive (or its assignee) to transfer an eleven and two-thirds interest to a trust, this Court concludes that summary judgment is appropriate on this ground as well.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendants' Renewed Motion in Limine (Dkt.# 119) is **DENIED as moot.**

2. Plaintiffs' Motion for Summary Judgment (Dkt.# 120) is **DENIED as moot.**

3. Defendants' Motion for Summary Judgment on Standing (Dkt.# 123) is **GRANTED in part** and **DENIED in part** as stated in this Order.

4. Defendants' Motion for Summary Judgment on Causation (Dkt.# 124) is **GRANTED in part** as stated in this Order and **DENIED in part** as moot.

5. USAB and Holdings are dismissed for lack of jurisdiction as parties to this action.

6. The Clerk is directed to terminate USAB and Holdings as parties to this action.

---

of its shares ... to any person or entity that is not an affiliate of the Class B Shareholder, the Class A shareholders [the Strouds] shall have the right to purchase the Class B stock subject to the same terms and conditions as are contained in the offer." (emphasis added).

**59.** Section 2.5 of the option uses the words "assign or transfer" instead of "offer to sell," which is used in the shareholder agreement.

**60.** Similarly, the conscious choice to use different terms than those contained in the option (an agreement drafted at the same time as the shareholder agreement) also counsels against reading the shareholders agreement any more broadly. Under Florida law, "[d]ocuments executed by the same parties, on or near the same time, and concerning the same transaction or subject matter are generally construed together as a *single contract*." *Quix Snaxx, Inc. v. Sorensen*, 710 So.2d 152, 153 (Fla. 3d DCA 1998) (emphasis added); *also Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So.2d 1278, 1280 (Fla. 5th DCA 2002) (stating same).

7. The Clerk is directed to enter judgment against HSN and Interactive in favor of Defendants.

8. The Clerk is directed to close this case and terminate all other remaining motions as moot.